**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

FILED

AUG - 5 2014

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

ALFREDO ROLANDO PRIETO,               )
                                      )
                    Petitioner,       )
                                      )
v.                                    )        Civil Action No. 3:13cv849–HEH
                                      )
KEITH W. DAVIS,                       )
                                      )
                    Respondent.       )

**MEMORANDUM OPINION**

In the Circuit Court of Fairfax County (hereinafter "the circuit court" or "the trial court"), Petitioner, Alfredo Rolando Prieto ("Prieto"), was convicted in 2008 on retrial of two counts of capital murder, rape, grand larceny, and two counts of the felonious use of a firearm while committing murder. In accordance with the jury verdict, Prieto was sentenced to death on December 16, 2010, after the case was remanded for resentencing based on a finding of error in the penalty phase of the trial. After unsuccessfully challenging the imposition of the death penalty on both direct appeal and on state collateral proceedings, Prieto now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter is before the Court on Respondent Keith W. Davis's Motion to Dismiss the petition. On June 11, 2014, the Court heard oral argument on the motion. For the reasons stated below, Respondent's motion must be granted.

## I. The Applicable Constraints Upon Federal Habeas Corpus Review

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he or she is "in custody in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective

Death Penalty Act ("AEDPA") of 1996 further circumscribed this Court's authority to

grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual

determinations are presumed to be correct and may be rebutted only by clear and

convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28

U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not

grant a writ of habeas corpus based on any claim that was adjudicated on the merits in

state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The United States Supreme Court emphasizes that the question "is

not whether a federal court believes the state court's determination was incorrect but

whether that determination was unreasonable—a substantially higher threshold." *Schriro*

*v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410

(2000)).

In light of the foregoing statutory structure, the findings of the Virginia courts

figure prominently in this Court's opinion.

## II.  Procedural History and Summary of the Evidence
### of Prieto's Guilt as to the Two Counts of Capital Murder[1]

> Prieto was indicted for capital murder based on the willful, deliberate, and premeditated killing of Rachael A. Raver in the commission of or subsequent to rape.  Prieto also was indicted for capital murder based on the willful, deliberate, and premeditated killing of Raver and Warren H. Fulton III, as part of the same act or transaction.  In addition, Prieto was indicted for the rape of Raver, the felonious use of a firearm while committing the murder of Raver, the felonious use of a firearm while committing the murder of Fulton, and grand larceny of Raver's automobile.

*Prieto I*, at 375.  Prieto's 2007 trial ended in a mistrial due to juror misconduct.  *Id.* at 376.

In 2008, the circuit court conducted a retrial of the above charges.  *Id.* at 377.  At the 2008 retrial, "a jury found Prieto guilty of two counts of capital murder, two counts of use of a firearm in the commission of murder, rape, and grand larceny."  *Id.*  At the sentencing phase,

> the jury found as to the two counts of capital murder that Prieto had not proven by a preponderance of the evidence that he was mentally retarded.  In addition, the verdict form endorsed by the jury was based upon a finding of the "future dangerousness" or "vileness" aggravating factor without differentiating which factor or both factors; and the jury unanimously fixed Prieto's sentence at death for each of the two capital murder charges, and life plus twenty-six years for the other charges.  The circuit court sentenced Prieto in accordance with the jury's verdicts and entered final judgment.

---

[1] The relevant facts are drawn from the Supreme Court of Virginia's decision as found and recited in *Prieto v. Commonwealth*, 278 Va. 366 (2009).  Hereinafter the Court will refer to the opinion resolving: (1) Prieto's first appeal, *Prieto*, 278 Va. at 366, as "*Prieto I;*" (2) Prieto's second appeal, *Prieto v. Commonwealth*, 283 Va. 149 (2012), as "*Prieto II;*" and (3) Prieto's state habeas petition, *Prieto v. Warden of the Sussex I State Prison*, 286 Va. 99 (2013), as "*Prieto III.*"  In addition, the Court will refer to the record from Prieto's first appeal as "J.A.I," the record from his second appeal as "J.A.II," and the record from his state habeas petition as "J.A.III."

*Id.* The Supreme Court of Virginia aptly summarized the evidence at trial as follows:

### A. Guilt Phase Evidence

The last time Raver and Fulton were seen alive was after midnight on December 4, 1988 as they were leaving a Washington, D.C. restaurant with the intention of returning to Virginia in Raver's four door Toyota Corolla. On the morning of December 6, 1988, Raver's partially nude body was found lying in a field located at the 1800 block of Hunter Mill Road, which lies just south of the Dulles Toll Road in Fairfax County. Fulton's fully clothed body was found about 100 feet away from Raver's body. Raver's jeans, underpants, gloves, and shoes were found approximately halfway between the two bodies. Raver's car was not found at the scene of the murder nor at either Raver's or Fulton's residence.

Raver was killed by a single gunshot that entered her lower left back, traveled in a downward trajectory, and remained in her body. Dr. Frances P. Field, Assistant Chief Medical Examiner for the Northern Virginia District Medical Examiner's Office, who testified as to the cause of death of both Raver and Fulton, determined that Raver's wound would have been painful and death would not have been instantaneous. Raver also had scraping of the skin on her abdomen, legs, hands, and face, and a bruise on her neck. The abrasions on Raver's body were the result of pushing or pulling of her body; and the wounds were not caused by an animal, according to a medico-legal death investigator and wound identification expert at the medical examiner's office. Raver's body was found undressed from the waist down with her legs spread apart on the ground, and a glistening liquid was found on her thighs, which was collected on swabs and preserved as evidence.

In performing a physical examination of Raver's body, Dr. Field recovered evidence swabs, including from inside Raver's vagina, because Raver was a possible victim of sexual assault. Dr. Field also took pubic combings from Raver to remove any hair foreign to Raver that may be present. The evidence was sealed and delivered to the Fairfax County police.

Fulton was also killed by a single gunshot, which entered the middle of his back, traveled in a downward trajectory, and remained in his body.

The bullets were recovered from Raver and Fulton's bodies and transferred through a documented chain of evidence to Julien J. Mason, Jr., a forensic scientist in the field of firearms and toolmark identification. Mason examined the bullets and testified that the bullets were .38 or .357 caliber bullets fired from the same weapon, a revolver.

4

Although Raver's car was not located by Fairfax County police, it was next observed in New York City just prior to noon on December 5, 1988, the day before the bodies were found. A New York City patrol officer ticketed Raver's car while it was parked in Queens, New York. Months later, when Raver's mother received a past due parking ticket on the car, it was then secured in a New York City police garage and finally examined by Fairfax County police. Raver's car had been "stripped totally" and the interior was "trashed." No "readily visible" evidence was observed.

Shortly after the murders, the vaginal swabs obtained from Raver's body were examined and tested in an effort to identify a suspect. In January 1989, biological evidence obtained from the physical examination of Raver was delivered to Lifecodes Corporation in New York for DNA profiling, a new technology at the time. The analysis was to be used in the event a suspect was identified. Lifecodes extracted DNA from Raver's vaginal swabs and found DNA foreign to Raver, but at that time there was no suspect for a comparison to be made. The Fairfax County police received the returned evidence in June 1989.

Ten years later in 1999, biological evidence was examined by Carol Palmer, Group Supervisor in the Forensic Biology Section of the Virginia Department of Forensic Science Laboratory (the laboratory) and an expert in the field of DNA analysis. Palmer testified that

> [t]here came a time [in 1999 when the laboratory] had a type of . . . DNA analysis, that could be used on cases that had been deemed cold cases, cases that had been worked in previous years where now DNA testing might be able to provide additional information.

Palmer testified that DNA testing can be used to make an association or disassociation between individuals and samples or items collected from crime scenes.

The biological evidence Palmer examined included a sample of Raver's blood and vaginal swabs from Raver. Palmer obtained a foreign DNA profile from the vaginal swab. When Palmer compared the foreign DNA profile from Raver's vaginal swab to a DNA profile obtained from a sample of Fulton's blood, Fulton was eliminated as the contributor of the foreign profile.

In September 2005, almost 17 years after the murders, when Prieto was identified as a suspect, a cheek buccal swab was obtained from Prieto for the purpose of collecting DNA material. In October 2005, Palmer compared the foreign DNA profile from Raver's vaginal swab and the swabs collected from Raver's thighs at the scene with the DNA profile obtained from Prieto. Palmer was unable to eliminate Prieto as the contributor of the foreign DNA profile from Raver's vaginal swabs and from swabs collected

from Raver's thighs. Palmer testified that she "would expect to find this profile only once in greater than the world population," and that the probability of finding the same DNA profile as found on the vaginal swab was one in 90 quadrillion in the Caucasian population, one in 900 quadrillion in the black population, and one in one quadrillion in the Hispanic population.

### B. Penalty Phase Evidence

Upon Prieto's conviction by the jury of two counts of capital murder, the court conducted a sentencing proceeding as required by Code § 19.2-264.4. Prieto had timely provided notice of his intent to present expert testimony to support his claim of mental retardation pursuant to Code § 19.2-264.3:1.1(C), and the issue of Prieto's mental retardation was determined by the jury as part of the sentencing proceeding in his bifurcated trial.

At the sentencing proceeding, the Commonwealth introduced evidence of Prieto's prior convictions. The prior convictions included a drive-by shooting of three people on or about August 25, 1984 and an escape committed on or about August 16, 1985. The evidence of prior convictions also included a series of crimes committed in California on or about September 2, 1990: the rape and murder of a 15 year old girl, two attempted murders, two additional rapes, three kidnappings, two robberies, two attempted robberies, and possession of a firearm by a felon. Prieto was sentenced to death in California for the murder of the 15 year old girl, who was found in a remote, open field, partially unclothed, and lying on her back with her legs spread apart. She was killed by a single gunshot wound.

Evidence was also introduced that Prieto raped and murdered Veronica Jefferson, a young professional woman, whose naked body was discovered on May 11, 1988 on the grounds of an elementary school in Arlington, Virginia. Jefferson died from a single gunshot wound to the chest. Prieto's DNA profile could not be eliminated as the source of genetic material obtained from vaginal swabs from Jefferson and from her jacket.

The Commonwealth presented testimony from eight family members concerning the impact of the deaths of Raver and Fulton. In mitigation, Prieto presented five family members to describe his difficult upbringing in El Salvador and how he moved to California as a teenager and became involved with gangs. The jury also heard from Prieto's priest from prison in California.

Dr. Ricardo Weinstein testified that Prieto was mentally retarded. Dr. Pablo Stewart testified that Prieto suffered from post-traumatic stress disorder as a result of his experiences in El Salvador. Dr. James R.

Merikangas testified that Prieto suffered from brain damage affecting his right frontal lobe, resulting in reduced impulse control. Dr. Leigh D. Hagen testified for the Commonwealth that Prieto was not mentally retarded within the meaning of Code § 19.2-264.3:1.1(A).

*Prieto I*, at 374–81 (alterations and omissions in original).

### III. 2010 Resentencing And State Habeas

Prieto appealed his convictions to the Supreme Court of Virginia, which affirmed all of his convictions on September 18, 2009. *Prieto I*, at 374. "However, because the verdict forms utilized by the jury in imposing death sentences in the capital murders were defective," the Supreme Court "reverse[d] the two sentences of death and remand[ed] the case for resentencing." *Id.*[2]

On remand on November 5, 2010,

following a new penalty phase, a jury unanimously found both aggravating factors of future dangerousness and vileness, either of which provides sufficient grounds for the imposition of the death penalty in the Commonwealth under Code § 19.2-264.2, and again recommended two death sentences. On December 16, 2010, the circuit court entered a final order imposing the death penalty.

*Prieto II*, at 157. The Supreme Court of Virginia found no error in the circuit court's judgment and, accordingly, affirmed the circuit court's decision on January 13, 2012. *Id.*

On October 1, 2012, the U.S. Supreme Court denied Prieto's second petition for a writ of certiorari from the state court's final judgment. *Prieto v. Virginia*, 133 S. Ct. 244 (2012).

---

[2] Before the case was heard on remand for resentencing by the circuit court, the U.S. Supreme Court on June 14, 2010 denied Prieto's petition for a writ of certiorari from the state court's final judgment. *Prieto v. Virginia*, 560 U.S. 969 (2010).

Thereafter, Prieto filed a state petition for a writ of habeas corpus alleging several claims. *Prieto III*, at 99. After reviewing all of the claims in Prieto's petition, the Supreme Court of Virginia concluded on September 12, 2013 that the Respondent's Motion to Dismiss should be granted and the writ of habeas corpus should not issue. *Id.* at 99.

Prieto filed a federal writ of habeas corpus with this Court under 28 U.S.C. § 2254. Under 28 U.S.C. § 2254(d)(1), this Court may issue a writ of habeas corpus only if Prieto's state habeas proceedings resulted in a decision that was contrary to or involved an unreasonable application of, clearly established federal law. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

## IV. Petitioner's Grounds for Federal Habeas Corpus Relief

Prieto raises the following grounds for federal habeas corpus relief, which the Court recites verbatim:

I.    Counsel Were Ineffective in the Investigation and Presentation of Evidence in the Guilt Phase of Prieto's 2008 Trial.

II.    During the 2010 Trial, Prieto Was Denied His Right to be Sentenced by an Impartial Jury and to Select Impartial Jurors in Violation of His Sixth Amendment Rights Under the Constitution.

III.    Counsel Were Ineffective for Failing to Develop and Present Mitigation Evidence at the 2010 Trial.

IV.    Counsel Were Ineffective for Unreasonably Failing to Develop and Present Mitigating Evidence of Prieto's Relative Culpability at the 2010 Trial.

V.    Prieto's Execution Is Barred by *Atkins v. Virginia*.

VI.    Counsel Were Ineffective for Failing to Present Evidence That Prieto Is Mentally Retarded and Therefore Ineligible for the Death Penalty.

VII.   At the 2010 Trial, Counsel Unreasonably Failed to Investigate and Present Evidence Rebutting the Commonwealth's Case in Aggravation.

VIII.  Counsel Unreasonably Failed to Properly Object to Evidence of Prior Convictions and Sentences.

IX.    The Trial Court Erred in Admitting Prieto's Records of Conviction and Death Sentence From California, in Violation of his Eighth and Fourteenth Amendment Rights.

X.     The Admission of Major Raver's Prejudicial Testimony in the 2008 Trial, and the Denial of Prieto's Motion for a Mistrial, in Contravention of Established Federal Law, Violated his Sixth and Fourteenth Amendment Rights Under the United States Constitution.

XI.    The Improper Admission of Prejudicial and Irrelevant Victim-Impact Testimony During the 2010 Trial, in Contravention of Established Federal Law, Violated Prieto's Sixth and Fourteenth Amendment  Rights Under the United States Constitution.

XII.   During the 2010 Resentencing, the Trial Court Denied Prieto his Right to a Fair Trial By Improperly Admitting Prejudicial Testimony of Velda Jefferson Regarding the Unadjudicated Murder of Veronica Jefferson.

XIII.  The Virginia Supreme Court Unreasonably Applied Federal Law When it Held that Judge Bellows' Recusal was not Mandated by Applicable Standards.

XIV.   The Trial Court Violated Prieto's Fifth Amendment Rights.

(§ 2254 Pet. ii–iii (punctuation corrected) (page numbers omitted), ECF No. 32.)

Respondent has filed a Motion to Dismiss.  (ECF No. 39.)  Prieto has responded. For the reasons that follow the Motion to Dismiss will be granted.  The Court dismisses Claims V and XIII as procedurally defaulted and the remaining claims for lack of merit.

## V. Exhaustion and Procedural Default

State exhaustion "'is rooted in considerations of federal-state comity,'" and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n.10 (1973)). The purpose of the exhaustion requirement is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). Exhaustion has two aspects. First, a petitioner must utilize all available state remedies before he can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate "'opportunity'" to address the constitutional claims advanced on federal habeas. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)) (additional internal quotation marks omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (quoting *Duncan*, 513 U.S. at 365–66). Fair presentation demands that a petitioner must present

10

"'both the operative facts and the controlling legal principles' associated with each claim" to the state courts. *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal habeas petitioner also procedurally defaults claims when he or she "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (quoting *Coleman*, 501 U.S. at 735 n.1).[3] The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citing cases). Absent a showing of cause and prejudice or a fundamental miscarriage of justice, this Court cannot review the merits of a defaulted claim. *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

---

[3] Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

11

Here, the Supreme Court of Virginia found that Prieto had procedurally defaulted his *Atkins* claim because he could have raised, but failed to raise, the claim on direct appeal. *Prieto III*, at 110–11 (citing *Slayton v. Parrigan*, 215 Va. 27, 29 (1974)). *Slayton* constitutes an adequate and independent state procedural rule when so applied. *See Mu'Min v. Pruett*, 125 F.3d 192, 196–97 (4th Cir. 1997). Thus, Claim V is procedurally defaulted and must be dismissed unless Prieto demonstrates cause and prejudice or a fundamental miscarriage of justice to excuse his default.[4]

Prieto contends that the ineffective assistance of counsel set forth in Claim VI constitutes cause to excuse his default. Prieto further asserts that the Court can review Claim V under the fundamental miscarriage of justice exception to the procedural default doctrine. (Pet'r's Resp. to Resp't's Mot. Dismiss 5, ECF No. 41.) Specifically, Prieto contends that "[i]f preventing a retarded petitioner from obtaining meaningful review of death sentence is not a miscarriage of justice, we cannot conceive what is." (*Id.*) For the reasons set forth later in this opinion, the Court rejects Prieto's attempt to excuse his default. Accordingly, Claim V will be dismissed. *See infra* Parts XIII-XIV.

In Claim XIII, Prieto contends Judge Bellows's comments at sentencing demonstrate his bias against Prieto and the Supreme Court of Virginia "unreasonably applied federal law when it minimized the requirement that proceedings *appear* to be just, and when it mischaracterized the context of the trial judge's comments at

---

[4] Prieto asserts "a claim under *Atkins* . . . can never be waived or defaulted." (§ 2254 Pet. 53.) Prieto is incorrect. *See Hedrick v. True*, 443 F.3d 342, 364–66 (4th Cir. 2005) (concluding that the petitioner procedurally defaulted his *Atkins* claim).

sentencing." (§ 2254 Pet. 72.) Respondent correctly notes that Prieto never exhausted

any of the federal constitutional aspects[5] of this claim.[6] If Prieto now attempted to return

to the Supreme Court of Virginia to satisfy the exhaustion requirement, that court would

find any federal constitutional aspects of Claim XIII barred under *Slayton*. Thus, Prieto

procedurally defaulted any basis for federal habeas relief in Claim XIII. Prieto fails to

demonstrate cause and prejudice or a fundamental miscarriage of justice excuses his

default of Claim XIII. Accordingly, Claim XIII claim will be dismissed.

### VI. Admission of Major Raver's Testimony in the 2008 Trial–Claim X

Prieto argues that the admission of Major Raver's allegedly prejudicial testimony

in the 2008 trial and the denial of his Motion for a Mistrial violated the Sixth and

Fourteenth Amendments. Major Raver, the sister of the victim Rachel Raver, testified at

the 2008 trial about her own, unrelated rape by an unknown assailant and the impact that

rape had on her life. (J.A.II at 23265–66.) Major Raver stated that her rapist "got away

with it." (J.A.II at 23265.) Defense counsel objected and moved for a mistrial. (J.A.II at

23266–23300.) The trial court denied the motion and after hearing argument, ruled that

Major Raver could continue her testimony, but was not permitted to testify about the

---

[5] In his § 2254 Petition, Prieto fails to explicitly identify the federal constitutional right violated. He appears to invoke the Due Process Clause of the Fourteenth Amendment.

[6] Prieto presented this claim solely as a violation of state law to the Supreme Court of Virginia. On his direct appeal, Prieto titled his argument: "The Clear Bias Shown By Judge Bellows during Mr. Prieto's Prior Sentencing Mandated Recusal Under Virginia Law." Opening Brief of Appellant at 14, *Prieto v. Commonwealth*, No. 110632 (Va. filed June 16, 2011) (emphasis omitted). Thereafter, in the argument portion of his brief, Prieto cited only Virginia authorities for his contention that Judge Bellows should have recused himself. *Id.* at 14–17; Reply Brief of Appellant at 1–3, *Prieto v. Commonwealth*, No. 110632 (Va. filed Sept. 6, 2011). Thus, Prieto failed to exhaust any federal constitutional aspects of Claim XIII on direct appeal. *See Baldwin*, 541 U.S. at 32; *Cook v. Schriro*, 538 F.3d 1000, 1030 (9th Cir. 2008).

circumstances of her own rape. (J.A.II at 23266–23300, 23302–05.) The trial court gave the following cautionary instruction: "You are to disregard Major Raver's statement that the person who raped her got away with it and give it no further consideration in this trial or in your deliberations." (J.A.II at 23314.) Counsel agreed to the proposed instruction, but defense counsel maintained its objection to Major Raver's testimony and the circuit court's ruling on the mistrial motion. (J.A.II 23308–309.) Major Raver was allowed to testify about the impact her sister's murder had on her own life. Specifically, she was permitted to testify about "that she was raped, and she has survivor's guilt because she survived and her little sister did not . . ." (J.A.II at 23311.)

Prieto argues the trial court erred in allowing Major Raver to continue her victim impact testimony in this way. He contends that her testimony did not fit within the parameters of Virginia and federal law, and that it was irrelevant and highly prejudicial. The instruction was inadequate, Prieto argues, noting that even where a cautionary instruction is given, denial of a motion for mistrial is reversible error if an impermissible statement "was so impressive that it probably remained on the minds of the jury and influenced their verdict." *Asbury v. Commonwealth*, 211 Va. 101, 104 (1970).

The Supreme Court of Virginia considered this claim and rejected it, finding that "victim impact testimony regarding a capital offense is admissible because it is probative of the depravity of mind component of the vileness predicate." *Prieto II*, at 167. This ruling is not contrary to or an unreasonable application of the Supreme Court's jurisprudence; neither does it rest upon an unreasonable finding of facts. 28 U.S.C. § 2254(d)(1)–(2); *Schriro*, 550 U.S. at 473 (citing *Williams*, 529 U.S. at 410).

14

The Supreme Court of Virginia explicitly held that

> [Major Raver's] own previous experiences were raised in the context of
> th[e] discussion [about the impact her sister's murder had on Major Raver's
> life]. This testimony, however, was not 'so far removed from the victims as
> to have nothing of value to impart' about the impact of the murder, and the
> circuit court did not abuse its discretion in allowing the testimony.

*Prieto II*, at 168 (citing *Beck v. Commonwealth*, 253 Va. 373 (1997)). The court

appropriately concluded the trial court did not abuse its discretion in allowing Major

Raver's victim impact testimony given that its admission is permissible under Virginia

and federal law. *Prieto II*, at 167-69.

The Supreme Court of Virginia's decision is consistent with U.S. Supreme Court

precedent: "[A] State may properly conclude that for the jury to assess meaningfully the

defendant's moral culpability and blameworthiness, it should have before it at the

sentencing phase evidence of the specific harm caused by the defendant." *Payne v.

Tennessee*, 501 U.S. 808, 825 (1991). "[T]he Eighth Amendment erects no *per se* bar"

to such evidence. *Id.* at 827. Moreover, "[a] State may legitimately conclude that

evidence about the victim and about the impact of the murder on the victim's family is

relevant to the jury's decision as to whether or not the death penalty should be imposed."

*Id.* Major Raver's testimony was just that – a description of "the impact of the murder on

the victim's family." *Id.*

Moreover, Major Raver's testimony was permitted under Va. Code § 19.2-264.4,

which allows victims to testify about the "impact of the offense upon the victim[,]" and

Va. Code § 19.2-11.01, which defines "victim" in this context (and that definition

encompasses Major Raver was a member of the deceased's family). *Prieto II*, at 167–68.

15

The Supreme Court of Virginia "has held and continues to hold that 'victim impact testimony regarding a capital offense is admissible because it is probative of the depravity of mind component of the vileness predicate.'" *Prieto II*, at 167 (quoting *Andrews v. Commonwealth*, 280 Va. 231, 291–92 (2010) (citing *Weeks v. Commonwealth*, 248 Va. 460, 476 (1994), *cert. denied*, 516 U.S. 829 (1995)).

The Supreme Court of Virginia properly held that the inclusion of Major Raver's testimony is also consistent with federal law. *Prieto II*, at 167–68. "Virginia law is in accord with the decisions of the Supreme Court of the United States, holding that a '[s]tate may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the . . . decision as to whether or not the death penalty shall be imposed.'" *Prieto II*, at 167 (quoting *Beck v. Commonwealth*, 253 Va. 373, 381 (1997) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)), *cert. denied*, 522 U.S. 1018 (1997))).

The Supreme Court of Virginia's factual and legal findings with respect to the admission of Major Raver's victim impact testimony are supported by the record, as outlined *supra* at the introduction of this claim. Accordingly, the trial court did not abuse its discretion when it admitted that testimony.

In addition, the trial court did not err in denying defense counsel's motion for a mistrial. The Supreme Court of Virginia correctly explained that "[s]o long as [the] prejudicial effect does not outweigh its probative value, such evidence is beneficial to the determination of an individualized sentence as is required by the Eighth Amendment." *Prieto II*, at 167 (quoting *Beck*, 253 Va. at 382 (citing *Payne*, 501 U.S. at 825)). This

16

Court agrees with the Supreme Court of Virginia's conclusion that any prejudicial effect of Major Raver's original comment that her rapist "got away with it" does not outweigh its probative value here, warranting a mistrial. *Prieto II*, at 168–69.

This Court also agrees with the court's finding that the circuit court's proper and prompt curative instruction upon the jury's return immediately after hearing oral argument was appropriate and sufficient to cure any prejudice flowing from the comment. *Prieto II*, at 169. The Supreme Court of Virginia's ruling is not an unreasonable application of the U.S. Supreme Court's jurisprudence; neither does it rest upon an unreasonable finding of facts. 28 U.S.C. § 2254(d)(1)–(2); *Schriro*, 550 U.S. at 473 (citing *Williams*, 529 U.S. at 410).[7]

Between the time Major Raver made her initial comments and when the court instructed the jury, the court recessed the jury, heard extensive argument over defense counsel objections, and made its rulings. (J.A.II 23265–266, 23314.) This was a reasonable amount of time. The jury was also explicitly instructed with respect to the statement to be disregarded, and the instruction was carefully given so that every aspect of the issue was addressed. The Court considers the nature of Major Raver's comment that her rapist "got away with it" in relation to the rest of the evidence, and finds that the

---

[7] This Court's review of the record verifies the Supreme Court of Virginia's conclusion that

> [n]o accusation was ever made that Prieto had any connection with Major Raver's rape. Despite having had time to ruminate over her statement, in the situation presented, no reasonable juror would assume that he or she was implicitly invited, as Prieto alleges, to levy additional retribution upon him arising from unrelated crimes committed long ago against Major Raver.

*Prieto II*, at 169.

context of the statement does not justify a mistrial. Thus, this Court finds that the trial court did not abuse its discretion in denying a mistrial.

Having found no error in the trial court's admission of Major Raver's victim impact testimony and denial of a mistrial, this Court dismisses Claim X.

## VII. Alleged Ineffective Assistance of Counsel During The 2008 Trial–Claim I

### A. Standard for Ineffective Assistance of Counsel Claims

This Court reviews Prieto's ineffective assistance of counsel claims (Claims I, III, IV, and VI) under the following standard. In *Strickland v. Washington,* 466 U.S. 668 (1984), the U.S. Supreme Court articulated its Sixth Amendment standard for measuring the effectiveness of counsel. There, the court announced a two-part test for evaluating a claim of ineffective assistance of counsel. First, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88. In its evaluation of an attorney's performance, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. This presumption of soundness includes strategic decisions viewed in context of the circumstances at hand. *Id.* As the U.S. Supreme Court has recently pointed out, however, "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith,* 539 U.S. 510, 533 (2003) (quoting *Strickland,* 466 U.S. at 690–91).

The U.S. Supreme Court further noted, in *Wiggins,* that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter

18

how unlikely the effort would be to assist the defendant at sentencing.  539 U.S. at 533

(citation omitted).  *Wiggins* also advises that "a court must consider not only the quantum

of evidence already known to counsel, but also whether the known evidence would lead a

reasonable attorney to investigate further."  *Id.* at 527.

Once a petitioner demonstrates that his counsel's representation fell below an

objective standard of reasonableness, then in order to obtain relief, he must also show

prejudice.  To demonstrate prejudice, the petitioner must show that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.  A reasonable probability is a probability sufficient to

undermine confidence in the outcome."  *Strickland*, 446 U.S. at 694.

### B.     Alleged Ineffective Assistance of Counsel at the Guilt Phase

At the 2008 trial, defense counsel conceded that Prieto's DNA linked him to the

crimes, but sought to raise a reasonable doubt in the jurors' minds as to whether Prieto

acted alone or was the immediate perpetrator of the murders.  If the jurors failed to find

that Prieto was the immediate perpetrators of the murders, they could not find him guilty

of capital murder.  *See Prieto I*, at 395.

In Claim I, Prieto contends that counsel performed deficiently by failing "to

reasonably investigate and present forensic evidence supporting the presence of another

person involved in the crimes and rebutting the Commonwealth's argument that Prieto

acted alone." (§ 2254 Pet. 11–12.)  Specifically, Prieto contends that counsel failed to:

> (1) provide jurors with evidence regarding DNA recovered from Raver's
> vagina indicating that a person other than Prieto deposited genetic material
> inside Raver's vagina; (2) secure DNA testing of anal swabs from Raver's

autopsy that reasonably could have uncovered additional evidence of a second perpetrator; and (3) present evidence [regarding the timing of the loss of the] Negroid hairs recovered from combings of Raver's pubic area . . . .

(*Id.* at 12 (internal citations omitted).)

Before addressing the detailed factual circumstances of each of these alleged deficiencies, a more general discussion of Prieto's guilt and his interaction with defense counsel is appropriate. First, Prieto has an onerous task to demonstrate prejudice because, as the Supreme Court of Virginia accurately observed, "the evidence was overwhelming that Prieto was the sole perpetrator of the murders." *Prieto III*, at 101 (citing *Prieto I*, at 398–401). In addition to the DNA evidence linking Prieto – and only Prieto – to the crimes, the following circumstantial evidence indicated that Prieto was the sole perpetrator of the crimes:

> The field where Raver and Fulton's bodies were discovered in December 1988 was located at the 1800 block of Hunter Mill Road, which lies just south of the Dulles Toll Road in Fairfax County. Prieto was familiar with the area as prior to the time of the murders, he worked with a crew cutting grass and driving trucks along the Dulles Toll Road, near where the bodies were found. When the police thoroughly searched the scene of the murders, there was no evidence discovered, other than potentially the lost hair evidence, that pointed to the existence of a second suspect.
> Raver and Fulton were each killed by a single gunshot wound. The bullets recovered from their bodies were fired from the same weapon. The weapon was determined to be a revolver. Prieto owned a revolver around the time of the murders. There was no evidence of a second weapon involved in the murders or present at the scene of the murders.
> The Commonwealth's theory of the murders was that Raver and Fulton were abducted and taken to the scene of the murders in Raver's car. When Raver and Fulton drove in her car to Washington, D.C. the last night they were seen alive, the backseat of the car contained a large box filled with miscellaneous items. There was only enough space for one additional person to sit in the backseat of the car. It was fewer than 36 hours after

20

Raver and Fulton were last seen alive when the car was observed in New York City.

Circumstantial evidence from the scene included Raver's body being found a short distance from where all her clothes except her bra, sweater, coat, and socks were located. The evidence of scraping on her body and the presence of Prieto's semen in her vagina support the conclusion that she was raped at the scene by Prieto, and there was no evidence of any other person's participation in the assault, rape, or murders.

*Prieto I*, at 399–400.

Second, in evaluating the performance of counsel with respect to the investigation of an alleged second perpetrator, the Court considers what information Prieto provided to counsel indicating he committed the rape and murders with another individual. The U.S. Supreme Court has emphasized:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 691. Tellingly, Prieto fails to direct the Court to any instance where he informed counsel that he committed the rape and murders with another individual. Such an omission certainly played a significant role in the amount of time and resources counsel deemed appropriate with respect to investigating evidence to support a second perpetrator theory. *See Mueller v. Angelone*, 181 F.3d 557, 580 (4th Cir. 1999).

### 1. DNA Evidence from the Vaginal Swab of Raver

Prieto first asserts raw data from the DNA analysis of samples recovered from Raver's vagina includes evidence of a 12 allele at the vWA locus, which was not found in the DNA profile for Prieto, Raver, or Fulton. The Supreme Court of Virginia aptly summarized Prieto's argument as follows:

> Testing conducted on three occasions in 2000 by Carol Palmer, a forensic scientist of the Virginia Department of Forensic Science, showed a "12" allele at the vWA locus of the non-sperm fraction from the vaginal swabs taken from Raver. Neither Raver nor Prieto have a "12" allele at that locus. Prieto argues the presence of the "12" allele shows another perpetrator also sexually assaulted Raver. Prieto contends counsel was deficient for failing to notice the "12" allele and to argue at trial that it showed the presence of another perpetrator.
>     Prieto further argues counsel failed to have Dr. J. Thomas McClintock, a DNA expert appointed to assist Prieto, review this information to determine if it supported the presence of a second perpetrator. In support, Prieto provides Dr. McClintock's affidavit, stating he was never asked to look at the documentation pertaining to the non-sperm fraction of the vaginal swab and that had he known of the presence of the "12" allele he would have testified that it represented a foreign allele. Prieto contends this evidence was the strongest evidence available in support of the defense theory that a second perpetrator committed the murders. Prieto argues that had this evidence been presented, it would have "raise[d] reasonable doubt in jurors' minds about whether the evidence proved that Prieto acted alone or was an immediate perpetrator of the murders" and would have likely "required a jury to acquit Prieto of capital murder."

*Prieto III*, at 100 (alteration in original). The record, however, reveals a thorough and exacting analysis of the DNA material recovered from Raver's vagina that dispels Prieto's suggestion that DNA evidence of a second perpetrator existed.

The pertinent DNA testing employed by the Virginia Department of Forensic Science ("DFS") determined genetic marker ("alleles") at different locations ("loci") on

the human genome. Resp't's Mot. Dismiss Pet. for a Writ of Habeas Corpus Ex. A

("Palmer Aff.") ¶ 7, *Prieto v. Pearson*, No. 122054 (Va. filed Jan. 2, 2013). In

conducting DNA analysis,

> [e]nzymes are applied to a sample which copy selected portions of the
> DNA molecule to increase, or amplify, the genetic material available for
> analysis. The amplification process can create small amounts of genetic
> material which are not representative of the original sample, and which are
> classified as artifacts. These artifacts are well characterized, expected and
> are reproducible.

(*Id.* ¶ 9.) During the review of the amplified samples, "scientists observe the resulting

short tandem repeats ('STRs') and determine, based on size of the fragments, which

alleles are present at various loci." (J.A.III at 9940–41 (punctuation corrected).) "Based

on training and experience, and standards put in place by DFS, scientists make allele calls

to determine which peaks are real and which are merely artifacts or false alleles." (J.A.III

at 9941.)

Here, some of the amplified raw data readings indicated a possible 12 allele at the

vWA locus on the non-sperm portion of the biological material from the vaginal swab of

Raver.[8] (§ 2254 Pet. 15 (citing J.A.III at 19, 21, 22).) Dr. Palmer determined the 12

allele at the vWA locus to be an artifact and not a real allele. (Palmer Aff. ¶ 7.) Dr.

Palmer explains that,

> [t]he only DNA profiles observed in the Item V-6 vaginal sample were
> attributed to Alfredo Prieto and Rachael Raver. If the 12 artifact . . . was
> actually a true DNA type from an unknown third DNA donor, I would
> expect to see additional alleles and [an] imbalance between paired alleles or
> both. This is not the case here.

---

[8] Item V-6 is the vaginal swab of Raver.

(*Id.* ¶ 16.) Dr. Palmer further explains, "I also analyzed Item V-7, the known DNA sample of Rachel Raver, a separate sample of blood collected from her body by the medical examiner during her autopsy. There was also an artifact observed at the vWA locus in the 12 allele position of this known sample." (*Id.* ¶ 8.) "[O]bserving this 12 artifact in Rachael Raver's known DNA sample as well as the **non-sperm f[r]action** from Item V-6, Rachael Raver's own vaginal swab . . . supports [the] conclusion that there are only two donors in [the V-6] sample, Alfredo Prieto and Rachael Raver." (*Id.* ¶ 17 (emphasis added).)

Pursuant to DFS procedures, "for each DNA examination, an independent analysis of the DNA must be conducted by a second sizer or analyst." (*Id.* ¶ 10.) In Prieto's case, the second analyst "independently characterized this artifact at the 12 allele position of the vWA locus in Item V-6 the non-sperm fraction of the vaginal swab and Item V-7 the known sample from Rachel Raver as an artifact." (*Id.*) Furthermore, pursuant to DFS procedures, the DNA data from Dr. Palmer's "analysis and the independent second analyst is reviewed by a third scientist referred to as the technical reviewer. The technical reviewer also concluded that the 12 artifact was indeed an artifact and present in both samples." (*Id.* ¶ 11.)

Moreover, in this case, DNA testing was also "conducted at the Central Region DFS laboratory. This separate analysis of the samples at a separate facility conducted by a different scientist and independently reviewed by a different second analyst, and then by the same technical reviewer, reached the same conclusion" with respect to the 12 artifact at the vWA locus. (*Id.* ¶ 12.)

During the habeas proceedings, Prieto presented affidavits from Dr. Moses

Schanfield and Dr. J. Thomas McClintock. Dr. Schanfield represents that he spent 7.5

hours reviewing the DNA data and concludes the 12 allele in vWA position should have

been identified as a real allele and not an artifact. (J.A.III at 9943–45.) Dr. Schanfield

further avers the presence of the 12 allele indicates someone other than "Fulton or Prieto

penetrated Raver vaginally reasonably close to the time of [her] death." (J.A.III at 9945.)

Dr. McClintock stated:

> It was my understanding from trial counsel that my primary role
> would be to explore and if possible testify about the notion that had the
> Negroid hairs not been lost, "mitochondrial" DNA testing could have
> proven that the hair did not belong to Mr. Prieto. As far as I recall, counsel
> also specifically asked me to check the validity of the Department of
> Forensic Science['s] (DFS) conclusion about the sperm on the vaginal
> swab. I was not asked to look at the underlying document pertaining to the
> "non-sperm" fraction of the vaginal swab.
>     . . . .
> I have reviewed the affidavit of Dr. Moses Schanfield, and agree
> with the conclusions set forth in it with respect to the foreign profile on the
> non-sperm of V-6.
> Had I been asked at trial about the 12 allele at the [v]WA locus of
> the non-sperm fraction, I would have testified that to a reasonable degree of
> scientific certainty, it represents a foreign allele.

(J.A.III at 9968 (paragraph numbers omitted).)

In concluding that Prieto failed to demonstrate deficiency or prejudice, the

Supreme Court of Virginia made the following findings:

> The record, including the affidavit of Carol Palmer, demonstrates that
> Palmer observed the "12" allele at the vWA locus but determined it was an
> artifact, which is the byproduct of the DNA typing process resulting from
> the required amplification of samples. Palmer observed the same "12"
> allele artifact in an analysis of Raver's blood sample. The determination of
> the "12" allele as an artifact was confirmed when (1) the non-sperm
> fraction of the vaginal swab and Raver's blood were analyzed by a second

analyst and the results from Palmer's and the second analyst's testing were reviewed by a third scientist, and (2) when the samples were independently tested, re-tested, and those results reviewed at another Division of Forensic Science laboratory. This data, all of which was collected prior to the guilt phase of trial, supported Palmer's determination that the "12" allele was an artifact, not a real allele, as well as her conclusion that a third DNA donor was not present.

The affidavit of Dr. McClintock does not address the testing done at the second laboratory or how those results would have affected his opinion. Moreover, this Court has already extensively reviewed the evidence presented at trial and determined that the evidence was overwhelming that Prieto was the sole perpetrator of the murders. *Prieto*, 278 Va. at 398–401, []. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

*Prieto III*, at 101.

The Supreme Court of Virginia reasonably dismissed this portion of the claim.

First, as to the issue of deficiency, given Prieto's apparent silence regarding the presence

of a second perpetrator, counsel had little reason to believe that they should scrutinize the

raw data of the DNA testing of the non-sperm fraction of the vaginal swab of Raver.

Furthermore, Dr. Palmer's conclusion that only Raver's and Prieto's DNA appeared on

the vaginal swab was confirmed by numerous other scientists. Given these

circumstances, counsel did not act in a constitutionally unreasonable manner by failing to

unearth the alleged 12 allele at vWA locus for the DNA testing of the vaginal swab of

Raver. Second, given the extensive independent evaluation of Dr. Palmer's conclusions

and her explanation for the conclusion that the 12 allele is an artifact, Prieto fails to

demonstrate that a reasonable juror would conclude the DNA evidence indicated the

presence of a second perpetrator. Moreover, given the overwhelming evidence that

Prieto committed the crimes alone, no reasonable probability exists that Prieto would

have been found not guilty of the capital murders of Raver and Fulton had counsel

pursued the investigation Prieto now faults counsel for omitting.

### 2.   Anal Swabs

In another portion of Claim I, Prieto critiques counsel for failing to conduct further

tests of the anal swabs taken from Raver's person. (*See, e.g.*, § 2254 Pet. 14–15, 21.) A

certificate of analysis, dated December 27, 1988, reflects that "Spermatozoa and/or

spermatozoa head were identified in extracts of the vaginal swabs, anal swabs, and on

both vaginal smears (Item V-6)." (J.A.I at 11347–48.) Additionally, a laboratory note

from 1994 indicates that both anal swabs and vaginal swabs contained a "male fraction."

(J.A.III. at 1, 7.) Prieto contends that further testing of the anal swab could have

uncovered evidence of a second perpetrator.

> The Supreme Court of Virginia found:
>
> The record, including the trial transcript and Palmer's affidavit, demonstrates that the anal swabs, which contained a trace amount of spermatozoa, were tested twice. In 1989, the swabs were tested by an outside laboratory, LifeCodes. This analysis showed the presence of only Raver's DNA. The swabs were tested again in 1994 by another scientist at the Division of Forensic Science, George Li. Li's testing showed "[n]o conclusive DNA profile was obtained from . . . the extract of the anal swab."
>
> Subsequently, in 2000, Palmer inventoried the anal swabs and determined not to test them again because only a trace amount of spermatozoa had been present in the samples and most of the samples had been destroyed by the previous testing.

*Prieto III*, Va. at 101 (alteration and omissions in original). The Supreme Court of

Virginia found that Prieto failed to establish either deficiency or prejudice. *Id.* at 100.

The court concluded that, "Prieto fails to show that any testing could have been

conducted on the amount of the anal swab sample that remained and he fails to proffer what the results of any testing would have shown." *Id.* at 101–02.

While the parties dispute whether a sufficient amount of male DNA remained on the anal swab for testing, the Supreme Court of Virginia's ultimate rejection of this claim is eminently reasonable. First, counsel had little reason to believe DNA testing of any sperm on the anal swab would result in the identification of any individual besides their client. Second, Prieto fails to demonstrate any reasonable probability such testing would identify the presence of a second perpetrator, much less persuade the jury to reach a different result with the respect to the capital murder convictions. Accordingly, the Supreme Court of Virginia acted reasonably finding Prieto demonstrated neither deficiency nor prejudice.

### 3.    Hair Evidence

In the last portion of Claim I, Prieto contends that counsel performed deficiently with respect to the "Negroid hairs recovered from combings of Raver's pubic area." (§ 2254 Pet. 12.)[9] The Supreme Court of Virginia aptly summarized Prieto's arguments as follows:

> Prieto argues he was denied the effective assistance of counsel during the guilt phase of the trial because counsel failed to present evidence that the Negroid hairs recovered from combings of Raver's pubic area were lost after the Commonwealth had identified Prieto as the primary suspect and after the exculpatory nature of the hairs became apparent. Prieto further contends counsel erred by conceding at trial that the police did not act in bad faith when the hairs were either lost or destroyed. Prieto argues

---

[9] Prieto also mentions "the V-6 hair found on Raver's vaginal swab." (§ 2254 Pet. 18.) Prieto, however, fails to articulate, much less demonstrate any deficiency, on the part of counsel with respect to the hair particles recovered from the vaginal swab.

counsel's failure deprived Prieto of his "due process remedy," allowed the Commonwealth to unfairly undermine the probative value of the hairs, and diminished the efficacy of his theory of a second perpetrator.

*Prieto III*, at 102.

The duty to preserve evidence arises when the evidence "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 488–89 (1984). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

When the hair evidence was lost is critical to Prieto's claim. Prieto insists that the hair evidence "went missing *after* the Commonwealth had identified Prieto, who is Hispanic and has Mongoloid-Caucasian hair, as the primary suspect in the murders and after the exculpatory quality of the Negroid hairs had become apparent." (§ 2254 Pet. 12 (citation omitted) (footnote omitted).) Prieto contends that, once he was identified as a suspect, the Negroid hairs had obvious exculpatory value. As explained below, the Supreme Court of Virginia, found the Negroid hairs were lost before Prieto was identified as a suspect and thus before the hairs had any apparent exculpatory value.[10]

On direct appeal, the Supreme Court of Virginia provided the following history of the loss of Negroid hairs from the combing of Raver's pubic area:

---

[10] The Supreme Court of Virginia's finding as to when the hair evidence was lost is presumed correct unless Prieto rebuts it with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). As explained below, Prieto fails to do so.

29

Among the items of physical evidence that the medical examiner preserved during her examination of Raver's body were two hairs obtained from combings of Raver's pubic area. These two hairs were examined shortly after their discovery and were determined to be foreign to Raver. No further examination was conducted because there was no suspect's hair to which a comparison could be made. When Prieto was developed as a suspect almost 17 years later, the hairs were missing.

When Dr. Field, the medical examiner, performed her physical examination of Raver's body and recovered evidence swabs from inside Raver's vagina, she also took pubic combings from Raver to remove any foreign hair that may be present. According to Dr. Field, in a possible victim of a sexual assault, pubic combings are conducted to remove any foreign hair that might be present for comparison with a suspected assailant's hair.

In December 1988, within a week after Raver's body was discovered, Myron T. Scholberg, a forensic scientist for the Commonwealth of Virginia and a hair, fiber, and fabric expert, prepared a certificate of analysis concerning the results of hair examinations he conducted of Raver and Fulton. The Fairfax County police provided Scholberg with Raver's pubic hair combings, her known head hairs and pubic hairs, and a hair that was removed from a vaginal swab. Scholberg also received Fulton's head hairs and pubic hairs. At the time of Scholberg's examination, there was no suspect, so he had nothing with which to compare the samples. Scholberg was asked to determine if there were any hairs foreign to Raver in her pubic hair combings. According to Scholberg, at that time, DNA testing was not used by the laboratory.

Scholberg determined that Raver's known hairs were Caucasian, and observed two hairs of Negroid origin in her pubic hair combings, which could not have originated from Raver. One of the Negroid hairs was a head hair and the other was a head hair fragment. Scholberg testified that the head hair fragment was too small and did not contain enough of the hair or its characteristics to compare with a known sample. According to Scholberg, the head hair was a full-length hair with a root and was suitable for comparison purposes. However, Scholberg determined that this full-length hair was not forcibly removed, and therefore did not have a piece of tissue on the end of the root that could later be used for DNA analysis. Scholberg testified that he could not exclude the possibility that the hairs he examined were Hispanic in origin.

Scholberg's notes do not indicate he examined the hair on the vaginal swab. He was asked to report any foreign hairs, and he did not report that the hair on the vaginal swab was foreign to Raver. Scholberg also prepared a second report which indicated "examinations [were] being held in abeyance pending possible additional known hairs from a suspect."

30

In January 1989, when Scholberg was finished with his analysis of the hairs, Fairfax County Police Officer James F. Mowatt collected the recovered hairs in a sealed condition from the laboratory and took them to the police property room.

On September 21, 2005, almost 17 years after the murders, Fairfax County homicide detective Robert J. Murphy went to the police property room and retrieved a brown opaque envelope, which was the original container believed to contain the hair from Raver's pubic combings. He transported it to the laboratory and submitted it to Carol Palmer, the forensic scientist who was going to look at the hair and determine whether it would be suitable for DNA testing. Two days later, Palmer called Detective Murphy and told him that the envelope was empty. That same day, Detective Murphy went first to the laboratory and then to the police property room where he searched for the missing hair evidence, but could not find it. He located the envelope designated to contain the hair from the vaginal swab and transported it to the laboratory, but later learned the vaginal swab hair was missing as well.

Detective Murphy, along with another detective and property officers, searched the entire property room on four separate occasions. They looked at every single item of evidence in the case. At Detective Murphy's direction, the laboratory personnel searched the entire laboratory, including lockers and old property files. Despite the intensive search, the missing evidence was never located.

After Prieto became a suspect in the murders, a sample of his head hair was obtained for examination. Charles Linch, a hair examiner for the Commonwealth of Virginia, examined the sample of Prieto's head hair for purposes of classifying the hairs' race characteristics. Linch concluded that Prieto's head hairs were mixed, with Mongoloid and Caucasian characteristics. When Linch was asked if in his practice he would make an opinion based on one hair and a fragment of another, Linch said he would issue a report saying it was "characteristically this or characteristically that." He continued, "[i]f I say characteristically Negroid, that wouldn't mean it had to come from a black person. But it had Negroid characteristics, predominant Negroid characteristics. We all have mixtures in our head hair." According to Linch, "[n]one of [the hairs] had characteristically Negroid pigmentation. . . . [I]f these hairs were found individually [and I had] just a piece of one of the heavy pigmented ones, I might could [sic] make the error and call it a Negroid hair." Linch's report concluded that "[t]he head hairs exhibited are characteristically Mongoloid and characteristically mixed Mongoloid [/]Caucasian, racial characteristics."

Linch also testified about the transient nature of hair, which can be transferred from person to person. Linch testified that when an expert finds

31

another person's hair on a victim, there is no way the expert can determine how it got there unless the expert saw it either fall or be transferred.

Prieto filed a motion to bar capital punishment due to the loss of the hair evidence and the impact he maintains its unavailability had on the "triggerman" theory. The circuit court denied Prieto's motion to bar the death penalty based on the loss of evidence by the Commonwealth. The circuit court noted that "[n]o one is suggesting [the loss of the evidence] was done for bad purposes." Furthermore, the circuit court stated: "In this case, there is zero evidence at all; zero. Not a scintilla of evidence that this evidence was lost for any bad faith purpose, maliciously, or intentionally. In fact, the government literally turned the property room upside down looking for this evidence." The circuit court continued:

> So, I don't see any evidence that it was done intentionally, and absent evidence that it was done intentionally, or in bad faith, or maliciously . . . I cannot understand why the defense would be entitled to an adverse inference, because there is no reason at all for me to believe that there is anything about the fact that this evidence is missing that would warrant an adverse inference.

*Prieto I*, at 392–94 (alterations and omissions in original).

The Supreme Court of Virginia then went on to conclude that "since the lost hairs were only potentially useful evidence and the Commonwealth did not act in bad faith, the loss of the evidence does not constitute a due process violation that would require a reversal of Prieto's convictions." *Id.* at 397–98. Specifically, the court stated:

> [S]upport for the circuit court's finding that the lost hairs from Raver's pubic combings were only potentially exculpatory comes from the fact that the record does not reflect the whereabouts of the hairs from the years 1989 to 2005. Since the hairs were last observed in 1989 when Scholberg examined them prior to the evidence envelope being sealed, and they were not present in 2005 when the evidence envelope was next unsealed, *the reasonable inference to be drawn is that the hairs were lost at some time prior to 2005 when Prieto's DNA sample was taken for comparison purposes.* The hairs could not have apparent exculpatory value when there was no suspect with whom a comparison could be made. In fact, the Commonwealth believed there was inculpatory value to these hairs, which was why DNA analysis was attempted. Prieto himself referred to the

missing evidence as "potentially exculpatory" in his motion to bar the death penalty, though he now argues on appeal that the lost hairs had apparent exculpatory value.

*Id.* at 397 (emphasis added).[11]

In his present petition, Prieto faults counsel for failing to "present evidence that [the] Negroid hairs recovered from combings of Raver's pubic area went missing *after* the Commonwealth had identified Prieto . . . as the primary suspect in the murders and after the exculpatory quality of the Negroid hairs had become apparent." (§ 2254 Pet. 12 (footnote omitted).) Prieto, however, fails to direct the Court to any clear and convincing evidence to rebut the Supreme Court of Virginia's factual finding that the hair evidence was lost before Prieto became a suspect. *See* 28 U.S.C. § 2254(e)(1). Thus, the Supreme Court of Virginia reasonably disposed of this aspect of the claim. *See Prieto III*, at 102.

Prieto also faults counsel for conceding "there was no bad faith" on the part of the Commonwealth with respect to the loss of hair evidence. (§ 2254 Pet. 23.) The circuit court found there was no evidence whatsoever of bad faith. *See Prieto I*, at 394. Prieto insists a presumption of bad faith exists because the hair evidence went missing after

---

[11] The Supreme Court of Virginia also concluded that "the exculpatory value of the lost hair [was] inconclusive." *Prieto I*, at 396. The court noted:

> Scholberg classified Prieto's hair as Mongoloid/Caucasian, but testified that he could not exclude the possibility that the lost hairs were Hispanic in origin.
> Linch, whose analysis took place after the hairs were lost, also characterized Prieto's hair as mixed Mongoloid and Caucasian. However, Linch testified that if Prieto's individual hairs or only a piece of a heavily pigmented hair was found, Linch might mistakenly call it a Negroid hair. It is unclear from the record whether DNA analysis could have been performed on the hairs if they had not been lost.

*Id.* at 397.

Prieto became a suspect. (§ 2254 Pet. 32.) As reflected above, that is not the case. Prieto fails to provide the Court with any viable evidence of bad faith by the Commonwealth in the loss of the hair evidence. Thus, Prieto fails to demonstrate that defense counsel acted unreasonably in conceding the lack of evidence of bad faith. Because Prieto fails to demonstrate deficiency or prejudice, the Supreme Court of Virginia's rejection of this aspect of Claim I as well as Claim I in its entirety was reasonable. *See Strickland*, 466 U.S. 687-88, 694. Claim I is dismissed.

## VIII. Alleged Impartial Juror at 2010 Trial–Claim II

In Claim II, Prieto asserts that at his 2010 sentencing, he "was denied his right to be sentenced by an impartial jury and to select impartial jurors . . . in violation of his Sixth Amendment rights under the Constitution." (§ 2254 Pet. 26 (capitalization corrected) (emphasis omitted).) To obtain a new trial based on nondisclosure by a juror, the defendant must show that (1) the juror did not honestly answer a material question during voir dire; and (2) if the juror had provided an honest answer, it would have been a valid basis for a challenge for cause. *See United States v. Fulks*, 454 F.3d 410, 431 (4th Cir. 2006) (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)).

Prieto asserts that during voir dire, "Juror 23 withheld honest information about his history as a victim of repeated sexual assaults and there is reason to think he did so to hide his bias against a defendant who was convicted of violent sexual crimes. (§ 2254 Pet. 26–27.) In support of this claim, Prieto relies on an affidavit provided to state habeas counsel, wherein Juror 23 stated:

34

> I thought it was strange that I was not questioned by the attorneys when we were in the courtroom about some of the things in my past that seemed related to the case: my history of being a victim of sexual abuse and my history of drug use. I was in boarding school and I was sexually molested by the dean of the school repeatedly over the course of several years. I also had a family history, and personal history, of heavy drug use.

(J.A.III at 11458.) Analysis of Claim II requires review of Juror 23's responses to questions during the jury selection process and his failure to volunteer the information regarding his sexual abuse earlier.

### A.   Jury Questionnaire

Question 25 of the Jury Questionnaire asked:

> Have you, or has any member of your family or close friend or relative, ever been the victim of, or witness to a crime, whether or not that crime was reported to law enforcement authorities?

(J.A.III at 11468.)   Juror 23 answered "No." (J.A.III at 11468.)   Question 27 of Jury Questionnaire asked:

> Have you ever had to appear in court, or in any court proceeding, as a plaintiff, defendant, victim, or witness for any reason other than you have already explained above?

(J.A.III at 11469.) Despite his prior answer to Question 25, Juror 23 answered, "Yes," and explained, "I was assaulted by 3 men 6 years ago." (J.A.III at 11469.)

The Juror Questionnaire informed the jurors that the case for which they were summoned was the sentencing of Alfredo Prieto involving two counts of capital murder, which involved, "[t]he capital murder of Rachael Raver in the commission of or subsequent to raping her." (J.A.III at 11472.) Thereafter, the final question in the Juror Questionnaire asked:

Is there any other matter or information you feel that the judge or attorneys should know about you, not covered by this questionnaire? For example, have any concerns been raised by the experience of filling out this questionnaire that might affect your ability to sit as a juror or anything else that you feel we should know about?

(J.A.III at 11473.) Juror 23 did not list anything in response to the above question.

## B.  Voir Dire

During voir dire, the venire panel was asked whether anyone had "been a victim of what you feel was serious criminal conduct or wrongful physical conduct? It could be domestic violence, it could be street crime." (J.A.II at 20912–13). Juror 23 confirmed that he had been the victim of an assault and/or attempted robbery. (J.A.II at 20936.) Juror 23 assured the circuit court that the fact that he had been a victim would "not at all" influence his ability to sit on Prieto's jury. (J.A.II at 20937.) Finally, "near the end of voir dire, Juror 23 did not respond when asked if he thought of anything new as a result of anything that had been asked during the course of voir dire." *Prieto III*, at 105.

## C.  Analysis

In dismissing this claim, the Supreme Court of Virginia found:

Juror 23's responses do not show that he was intentionally withholding information or not honestly answering the questions posed to him. Rather, they show that Juror 23 may not have realized from the questions posed the need to address the sexual molestation he suffered as a youth. Moreover, Prieto fails to show that Juror 23 was biased against him. Multiple times during voir dire, Juror 23 indicated he could remain impartial before making a decision as to Prieto's sentence. Thus, Prieto has failed to demonstrate that Juror 23 failed to answer honestly a material question during voir dire, and he has consequently failed to show he was denied the right to an impartial jury. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 . . . (1984).

*Prieto III*, at 105–6. As explained below, the Supreme Court of Virginia's dismissal of this claim was reasonable.

First, the record supports the Supreme Court of Virginia's conclusion that, Juror 23's failure to mention the sexual molestation was the product of misapprehension, rather than an act of intentional nondisclosure.[12] Moreover, Prieto fails to demonstrate that Juror 23's history as a victim of sexual molestation during his youth warranted his removal from the jury. A "*McDonough* claim necessarily fails unless the court would have committed reversible error—that is, abused its discretion—in failing to dismiss [a prospective juror for cause]." *Fulks*, 454 F.3d at 432 (citing *United States v. Turner*, 389 F.3d 111, 115 (4th Cir. 2004)). "[A] failure to excuse a prospective juror constitutes an abuse of discretion in only two situations: (1) where a per se rule of disqualification applies; [or] (2) where the court demonstrates a clear disregard for the actual bias of the juror." *Fulks*, 454 F.3d at 432 (citation omitted) (internal quotation marks omitted).

With respect to the per se disqualification issue, Prieto must show "the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988). Prieto's brutal rape and double murder of two strangers bears little similarity to Juror 23's account of sexual molestation by the dean of his school. Prieto fails to demonstrate that, the fact that

---

[12] The tenor of Juror 23's responses does not indicate an attempt to hide pertinent information from the circuit court or counsel. During voir dire, Juror 23, admitted that he was the victim of an attempted robbery. Additionally, in the affidavit he provided to state habeas counsel, Juror 23 readily volunteered the information about the sexual abuse he suffered.

Juror 23 had been sexually molested as a youth, made it "highly unlikely" that Juror 23 "could remain impartial" in a case involving forcible rape and murder.[13] *Id.*; *see Fulks*, 454 F.3d. at 432–33 (rejecting an implied bias claim in capital murder trial where a juror failed to disclose that her husband had been murdered many years prior to the trial); *United States v. Powell*, 226 F.3d 1181, 1187–89 (10th Cir. 2000) (rejecting an implied bias claim where a juror, in a kidnapping and sexual assault case, had a daughter who had been raped ten years before); *Gonzales v. Thomas*, 99 F.3d 978, 989 (10th Cir. 1996) ("[I]s a rape victim as a matter of law incapable of being impartial in the trial of an accused rapist? We think not."). Finally, Prieto fails to demonstrate any actual bias by Juror 23. *Prieto III*, at 105.

The Supreme Court of Virginia's rejection of this claim does not rest upon an unreasonable finding of fact or constitute an unreasonable application of United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1)–(2). Accordingly, Claim II is dismissed.

## IX. Claims Pertaining to the California Crimes–Claims VII, VIII, IX, XI

### A. Alleged Ineffective Assistance of Counsel for Failing to Investigate and Present Evidence Rebutting Commonwealth's Case in Aggravation–Claim VII

Prieto argues that at the 2010 trial, counsel unreasonably failed to investigate and present evidence rebutting the Commonwealth's case in aggravation, in violation of the

---

[13] Prieto suggests that Juror 125 was removed from the jury simply because she had been a victim of rape. (§ 2254 Pet. 28.) That is not correct. Juror 125 was removed because she was unable to assure the circuit court that she could remain impartial in light of her history as a rape victim. (J.A.II at 22056–58.)

Sixth Amendment. Prieto contends counsel was aware that the Commonwealth, in support of its request for a death sentence in this case, was going to present evidence of Prieto's convictions and death sentence in California. The California convictions at issue are "for the rape and first-degree murder of Y.W., a fifteen year-old girl, two attempted murders, two additional rapes, three kidnappings, two robberies, two attempted robberies, and possession of a firearm by a felon." *Prieto III*, at 113.

> At the 2010 trial, the Commonwealth presented certified copies of Prieto's California convictions as well as his sentence of death for the first-degree murder conviction. The Commonwealth also presented testimony from one of the victims, Lisa Barajas, and from the lead investigator regarding the events that led to those convictions. At the time of Prieto's 2010 trial, counsel was aware of a pending petition for a writ of habeas corpus relating to the California convictions.

*Id.* Prieto's petition for a writ of habeas corpus is still pending.

Given trial counsel's knowledge about these convictions and the death sentence in California, Prieto argues that counsel unreasonably failed to investigate and present evidence to cast doubt on Prieto's role in the California offenses. He cites the following alleged errors, among others: (1) failing to present evidence that Prieto filed a petition for writ of habeas corpus in California in 2007, challenging his capital conviction and death sentence; (2) neglecting to highlight issues with Lisa Barajas's identification of Prieto as the man who raped and killed Y.W., and as the man who was directing others in the crime; (3) failing to address questions about whether Y.W. was raped, affecting the guilt and sentencing phases of the California trial; (4) considering the fact that the jurors in the California trial were not informed of evidence mitigating Prieto's behavior in that

trial, including his trauma disorder and drug use before and at the time of the crime; and (5) rebutting Prieto's other prior convictions.

Prieto argues that failure to investigate and rebut evidence in the California case fell below the level of reasonable performance. *See Rompilla v. Beard*, 545 U.S. 374, 383–87 (2005) (finding counsel ineffective for failing to inspect "public document[s]" on the offenses that would be used in aggravation and "seriously compromising their opportunity to respond to a case for aggravation."). Prieto notes that the obligation for counsel to learn what they could about the offenses intensifies when the offenses are similar and sentencing strategy focuses on issues of guilt. *Id.* at 386.

Emphasizing that the California offenses were central to the Commonwealth's arguments of future dangerousness in support of a death sentence in Virginia, Prieto contends that if trial counsel had presented this evidence, there is a reasonable probability that the jury's assessment of the Commonwealth's case in aggravation would have been different.

However, the Supreme Court of Virginia considered this ineffective assistance of counsel claim and rejected it, holding that Prieto had not satisfied either the "performance" or "prejudice" prongs of *Strickland*. *Prieto III*, at 113. For the following reasons, this ruling is not an unreasonable application of U.S. Supreme Court jurisprudence, and it does not rest upon an unreasonable finding of facts. Thus, federal habeas corpus relief is inappropriate. 28 U.S.C. § 2254(d)(1)–(2); *Schriro*, 550 U.S. at 473 (citing *Williams*, 529 U.S. at 410).

40

### 1.    Collateral Attack on the California Convictions

The Supreme Court of Virginia addressed the initial question of when a conviction

can be collaterally attacked.  The court correctly stated that a "collateral attack on a prior

conviction from a court of competent jurisdiction is normally not allowed as that

conviction is given a presumption of regularity, 'till the contrary appears.'"  *Prieto III*, at

113 (citing *Parke v. Raley*, 506 U.S. 20, 29–30 (1992) (quoting *Voorhees v. Jackson*, 35

U.S. (10 Peters) 449, 472, 9 L. Ed. 490 (1836))).

Prieto argues that the Supreme Court of Virginia mischaracterized the action

counsel should have taken as a "collateral attack" on the conviction.  Instead, Prieto

believes counsel was required to investigate and refute any prior bad acts and convictions

to be used in the Commonwealth's case in aggravation.  *See generally*, *Rompilla*, 545

U.S. at 374.  This Court finds that the Supreme Court of Virginia reasonably concluded

under *Parke* that counsel were "not ineffective for failing to attempt a collateral attack on

Prieto's California convictions" where Prieto's claims do not justify a collateral attack

and the ruling on the habeas petition in California has not occurred to rebut the

presumption. *Prieto III*, at 113.

The Court turns to Prieto's individual contentions.  Prieto argues that his filing for

a writ of habeas corpus in California in 2007, (J.A.III at 8723–9220), should have

prompted trial counsel to more thoroughly explore the following issues casting doubt on

Prieto's involvement in the California offenses.

## 2.   Identification and Seminal Fluid

First, Prieto contends trial counsel should have better addressed the problems with Lisa Barajas's identification of Prieto as the perpetrator in the California case.  According to Prieto, it is not enough that counsel objected to certain aspects of the evidence from the California case and merely noted in passing at a bench conference that "[t]here were identification issues in that case." (J.A.II at 23658–705, 23699.)  However, the Supreme Court of Virginia expressly rejected Prieto's claim with respect to Barajas's identification testimony.  In reaching this conclusion, the court appropriately relied on the trial transcript, which it found demonstrated "that Barajas was questioned extensively regarding her identification of Prieto . . . . Throughout the trial, Barajas was *adamant* in her identification of Prieto." *Prieto III*, at 114.  (emphasis added).  The record amply supports the Supreme Court of Virginia's determination that Barajas consistently and several times identified Prieto. (J.A.II at 23717–20, 22, 23.)  Barajas identified Prieto as the person who held a gun to her head, demanded her keys and money, and drove the car in which she was kidnapped. (J.A.II at 23717–19.)

Thus, this Court finds the Supreme Court of Virginia reasonably concluded counsel were not constitutionally obliged "to present evidence that has the potential of being 'double edged.'" *Prieto III*, at 114 (quoting *Lewis v. Warden*, 274 Va. 93, 116 (2007)).  Moreover, "[s]uch tactical decisions are an area of trial strategy left to the discretion of counsel and should not be second-guessed in a habeas corpus proceeding." *Prieto III*, at 114 (citing *Strickland*, 466 U.S. at 689–90.).

Second, Prieto argues counsel should have pursued the issue of whether Y.W. was actually raped by focusing on the absence of seminal fluid found on Y.W. The Supreme Court of Virginia rejected Prieto's contention that counsel should have investigated the lack of an expert to rebut California's theory for the absence of seminal fluid on Y.W. because Prieto did not "proffer the name or testimony of an expert regarding the seminal fluid." *Prieto III*, at 114–15 (citing *Muhammad v. Warden*, 274 Va. 3, 18 (2007)). Without such a proffer, the trial court had no basis to determine whether such expert testimony should have been admitted. "Thus, Prieto has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different." *Prieto III*, at 115.

### 3.    Mitigation, Evidence of Trauma, and Prior Convictions

Next, Prieto faults counsel for neglecting to present mitigation to rebut the Commonwealth's case in aggravation by failing to more thoroughly present evidence of trauma Prieto experienced and to investigate Prieto's prior convictions.

The Supreme Court of Virginia properly found "that counsel did present evidence of Prieto's trauma disorder and drug use around the time of the California crimes." *Prieto III*, at 108. This evidence included that Prieto suffered from Post-Traumatic Stress Disorder ("PTSD") from his childhood exposure during the El Salvadorian civil war, that Prieto suffered from deficits including long-term trauma, and the fact that he used drugs "was one of the factors that 'created a significant emotional disturbance in' Prieto and thus precipitated his violent crimes." *Id.* Prieto does not allege any additional evidence

counsel could have presented that would have rebutted the aggravating circumstances of the California offenses.  Thus, the Supreme Court of Virginia appropriately held "Prieto has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different." *Id.*

Prieto argues in a footnote that defense counsel unreasonably failed to rebut the Commonwealth's evidence of his other prior convictions, including firearms charges.[14] However, the Supreme Court of Virginia found that Prieto did not "proffer what evidence counsel should have presented to rebut the Commonwealth's evidence as to his other prior convictions." *Prieto III*, at 116.  Accordingly, the court reasonably held that "Prieto has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different." *Id.*

### 4.    Jury Instruction

Prieto contends an erroneous jury instruction in the California trial allowed jurors there to infer from his possession of Barajas's stolen car keys, with only slight corroborating evidence, that Prieto was guilty of all the crimes with which he was charged.  Prieto argues that trial counsel erred here by not pursuing this angle, which could have shown the error was prejudicial given questions discussed *supra* regarding identification, credibility, and whether Y.W. was raped.  Prieto argues this was

---

[14] Trial counsel objected to the admission of the firearms convictions on the basis that any prior convictions should not be admitted based on remoteness and lack of relevance. (J.A.II 23755–56.) The convictions were admitted over objection. (J.A.II at 23756.)

particularly prejudicial given that the Commonwealth cited the California offenses when they argued Prieto was a future danger and should be put to death. (J.A.II at 25897–99, 26017) ("the best predicator of future behavior I'd submit to you is past behavior. That's the future dangerousness thing.").

On automatic appeal from California's judgment of death, the Supreme Court of California held that the inclusion of non-theft offenses in this inference, such as rape and murder, was erroneous. *People v. Prieto*, 30 Cal. 4th 226, 248–49 (Cal. 2003). However, the court found the error was not prejudicial in part because the repeated identifications from surviving victims were reliable. *Id.* at 249. Given the Supreme Court of California's finding of harmless error, the Supreme Court of Virginia reasonably concluded the following:

> Prieto fails to state how presenting evidence at his 2010 trial of the erroneous jury instruction [in the California trial] would have mitigated the aggravating circumstances of his California offenses. Thus, Prieto has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

*Prieto III*, at 116. This Court agrees and holds that the Supreme Court of Virginia's ruling was reasonable.

For the foregoing reasons, Claim VII is dismissed.

### B.    Ineffective Assistance of Counsel for Failing to Properly Object to Evidence of Prior Convictions and Sentences–Claim VIII

Prieto argues that counsel unreasonably failed to object to evidence of prior convictions and sentences. The California convictions and sentence at issue were at the time of trial, and still are, under review by the California courts. Prieto contends counsel

failed to object to the admission of these convictions and death sentence under *Johnson v. Mississippi*, 486 U.S. 578 (1988).

In *Johnson*, jurors sentenced the defendant to death in Mississippi based on three aggravating factors. *Johnson*, 486 U.S. at 581. One of the aggravating factors was the fact that the defendant was previously convicted in New York of a felony involving the use of threat of violence to the person of another. *Id.* The sole evidence of that aggravating circumstance was "an authenticated copy of [the defendant's] commitment to [a New York state prison]" upon conviction "for the crime of second-degree assault with intent to commit first-degree rape." *Id.* The New York conviction was later reversed. *Id.* at 582.

Before the New York court granted post-conviction relief, the defendant filed a motion in the Mississippi court alleging he was entitled to post-conviction relief from his death sentence because his "New York conviction was invalid and could not be used as an aggravating circumstance." *Id.* at 583. The Mississippi court denied the motion, and the U.S. Supreme Court reversed, holding that allowing a death sentence to stand although based in part on a reversed conviction violates the Eighth Amendment. *Id.* at 583–85. In reaching that decision, the U.S. Supreme Court noted that "the reversal of the conviction deprive[d] the prosecutor's sole piece of documentary evidence of any relevance to Mississippi's sentencing decision." *Id.* at 585.

Here, the Commonwealth sought to prove "future dangerousness" at Prieto's 2010 sentencing by presenting certified copies of his convictions and death sentence in California for the murder of Y.W. No other evidence proving Prieto committed the

46

capital crime or that a death sentence was appropriate was presented. Prieto faults trial counsel for failing to raise this issue. He argues that if they had, there is a reasonable probability that the certified California convictions and death sentence would not have been presented to the jury.

Prieto emphasizes a number of alleged weaknesses of his underlying California convictions: There was testimony from Barajas who was present at incidents related to Y.W.'s murder, but Barajas did not claim to have witnessed Prieto murder or rape Y.W. or that Prieto was with Y.W. when she was shot. Moreover, there is a federal habeas petition pending in California, calling into question the legitimacy of that conviction and sentence. Thus, Prieto asks this Court to hold these proceedings in abeyance until resolution of the California habeas litigation so that this Court can assess the propriety of Prieto's death sentence.

The Supreme Court of Virginia considered this claim and rejected it, holding Prieto had not satisfied either part of *Strickland*. *Prieto III*, at 117. This ruling is not an unreasonable application of U.S. Supreme Court jurisprudence; neither does it rest upon an unreasonable finding of facts. 28 U.S.C. § 2254(d)(1)–(2); *Schriro*, 550 U.S. at 473 (citing *Williams*, 529 U.S. at 410). The Supreme Court of Virginia expressly found "[c]ounsel had no reason to object to the introduction of the evidence relating to Prieto's convictions and sentence in California as this Court had previously upheld the introduction of such evidence." *Prieto III*, at 117 (citing *Prieto I*, at 413–15).

The Supreme Court of Virginia appropriately distinguished *Johnson*, noting that in that case, the New York conviction was reversed while Johnson's motion for post-

conviction relief from his Mississippi death sentence was pending; thus, the Mississippi

court erred when it refused to consider that the conviction had been reversed. *Prieto III*,

at 117. However, "Prieto's California convictions and death sentence had not been

overturned, thus there was no basis for counsel to object to their introduction." *Id.* To

date, Prieto's California convictions and death sentence have not been overturned.

Consequently, there is no basis to find counsel was deficient or that there is a reasonable

probability that, but for these alleged errors, the result of the proceeding would have been

different. Nor is there justification under *Johnson* to hold this case in abeyance pending

California's consideration of the federal habeas petition there. Accordingly, Claim VIII

is dismissed.

### C.   Whether Trial Court Erred in Admitting Prieto's Records of Convictions and Death Sentence from California–Claim IX

Prieto asserts that the trial court erred in admitting records of his convictions and

death sentence from California, in violation of the Eighth and Fourteenth Amendments.

In support of this argument, Prieto claims that (1) the jury's knowledge that he was

already sentenced to death minimized the significance of their decision to sentence him to

death because he would be executed "anyway;" and (2) the jury's knowledge that a prior

jury had already found him to be a future danger and, thus, sentenced him to death,

unduly influenced the jury to make the same decision in this case.

Prieto cites *Caldwell v. Mississippi*, where the U.S. Supreme Court held that the

fundamental fairness of the decision to sentence the defendant to death was affected by

the prosecutor's argument that the responsibility for the imposition of death was with the

48

appellate court, not the trial court, and this violated the Eighth Amendment and required

the capital sentence to be vacated. 472 U.S. 320, 323 (1985). The U.S. Supreme Court

explained in *Romano v. Oklahoma* that *Caldwell* is "'relevant only to certain types of

comment—those that mislead the jury as to its role in the sentencing process in a way

that allows the jury to feel less responsible than it should for the sentencing decision.'"

512 U.S. 1, 9 (1994) (internal citation omitted). "Thus, '[t]o establish a *Caldwell*

violation, a defendant necessarily must show that the remarks to the jury improperly

described the role assigned to the jury by local law.'" *Id.* at 9 (quoting *Dugger v. Adams*,

489 U.S. 401, 407 (1989).). However, Prieto fails to raise an instance in which the

Commonwealth made any such improper argument.

There is simply no record of the Commonwealth making comments "'that misle[]d

the jury as to its role in the sentencing process in a way that allows the jury to feel less

responsible than it should for the sentencing decision.'" *Romano*, 512 U.S. at 9 (internal

citation omitted). The record does not bare any such misleading comments during

closing argument at sentencing. (J.A.II at 25870–25900, 25997–26023.) In fact, the

Commonwealth argued at sentencing that "the facts of these crimes [referring to the

crimes Prieto was convicted of in Virginia] *alone*, I submit to you, are sufficient not only

on the vileness prong, but on the [future dangerousness] prong, to establish this case."

(*Id.* at 25895) (emphasis added).

Moreover, the Supreme Court of Virginia already considered this claim in Prieto's

first direct appeal and rejected it, expressly finding evidence of the California convictions

and death sentence was admissible. *Prieto I,* at 413–15. This Court finds that the

Supreme Court of Virginia did not unreasonably apply U.S. Supreme Court law and did not rest upon an unreasonable finding of facts in reaching its conclusion. 28 U.S.C. § 2254(d)(1)–(2); *Schriro*, 550 U.S. at 473 (citing *Williams*, 529 U.S. at 410).

"In federal habeas actions, we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000). For the many reasons discussed herein, Prieto was not denied a constitutionally fair proceeding with respect to the introduction of the California record. The Supreme Court of Virginia appropriately relied on Va. Code §§ 19.2-295.1,[15] 19.2-264.4(B),[16] and *Bassett v. Commonwealth*, 222 Va. 844, 858 (1981), *cert. denied*, 456 U.S. 938 (1982)[17] to conclude that the California record was properly admitted. *Prieto I*,

---

[15] Upon a finding that a defendant is guilty of a felony, Va. Code § 19.2-295.1 requires the Commonwealth to "present the defendant's prior criminal history, including prior convictions and the punishments imposed, by certified, attested or exemplified copies of the final order, including adult convictions and juvenile convictions and adjudications of delinquency."

[16] Code § 19.2-264.4(B) provides, in pertinent part:

> In cases of trial by jury, evidence may be presented as to any matter which the court deems relevant to sentence, except that reports under the provisions of § 19.2-299, or under any rule of court, shall not be admitted into evidence.

> Evidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense.

[17] In *Bassett v. Commonwealth*, 222 Va. 844, 858 (1981), *cert. denied*, 456 U.S. 938 (1982), the court held that the circuit court properly admitted a defendant's prior sentence and conviction for armed robbery during the penalty phase of his capital murder trial, which did not result in a death sentence. *Prieto I*, at 414.

at 414–15. Thus, under Virginia Code and case law, the California convictions and death sentence were admissible.

Further, as the Supreme Court of Virginia noted, "it is speculation that knowledge of an already existing death penalty might trivialize the jury's decision, so that the jury might impose a death sentence with less deliberation if it knows that the defendant has already been sentenced to death." *Prieto I*, at 414. In light of the U.S. Supreme Court's findings in *Romano*, 512 U.S. at 1,[18] this Court agrees with the Supreme Court of Virginia's finding that it would be "entirely speculative" here whether the jury would be more or less likely to impose death based on an existing death sentence. *Prieto I*, at 415.

Prieto attempts to show that the introduction of his California convictions and death sentence was unconstitutional by contrasting this case with *Romano*. Prieto contends that the introduction of his prior death sentence in California was even more irrelevant to his sentencing in this case than the prior death sentence presented in *Romano*.

---

[18] The U.S. Supreme Court in *Romano* noted

> it is impossible to know how [the evidence of the petitioner's other death sentence] might have affected the jury. It seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so. Either conclusion necessarily rests upon one's intuition.

*Romano*, 512 U.S. at 14. Accordingly, the court declined to hold "that the admission of evidence relating to petitioner's sentence [in another] case rendered petitioner's sentencing proceeding for the [murder in the case at bar] fundamentally unfair would thus be an exercise in speculation, rather than reasoned judgment." *Id.*

The U.S. Supreme Court held in *Romano* that the evidence of a capital defendant's prior murder conviction and death sentence in a capital sentencing proceeding did not violate the Eighth Amendment even though such evidence was irrelevant to the imposition of death because it was later found invalid. *Romano*, 512 U.S. at 3. Prieto argues the admission of his prior sentence from California[19] was even less relevant than that at issue in *Romano* because other evidence establishing future dangerousness was presented at the sentencing in that case. The jury in *Romano* found four aggravating factors – not just the one aggravating factor based upon the irrelevant conviction and death sentence, which would have established that the defendant had been convicted of a prior violent felony. *Id.* at 5.[20]

Despite the fact that Romano's death sentence was deemed irrelevant, the U.S. Supreme Court noted that "if the jurors followed the trial court's instructions, which we presume they did, *see Richardson v. Marsh*, 481 U.S. 200, 206-207, 211 [] (1987), this evidence should have had little -- if any -- effect on their deliberations." *Romano*, 512 U.S. at 13. The instructions emphasized "the jurors' paramount role in determining

---

[19] Prieto contends it is significant that the prior convictions and death sentence introduced in the sentencing in the case at bar was from California, which has had a judicially-imposed moratorium on executions since 2006. *See Morales v. Tilton*, 465 F. Supp. 2d 972 (2006); *see also, Jones v. Chappell*, No. 09-02158-CJC (C.D. Cal. July 16, 2014) (finding the death penalty system in California violates the Eighth Amendment, and thus, vacating a defendant's death sentence who was sentenced to death in 1995, but still has not been executed). While the fate of the death penalty in California may be uncertain, it is evident that Prieto's California convictions and death sentence remain and, thus, are relevant to the statutorily-required aggravating factors of Va. Code § 19.2-264.2.

[20] While Romano's appeal was pending, his death sentence that had been presented to the jury in support of the aggravating factor at issue was overturned and that case was remanded because his prior trial should have been severed from his codefendant's. *Romano*, 512 U.S. at 5–6.

petitioner's sentence" and "explicitly limited the jurors' consideration of aggravating factors to the four which the State sought to prove." *Id.* While the overturning of the prior conviction invalidated the aggravating circumstance of a prior conviction of a violent felony, the death sentence was substantiated when the state appellate court weighed the remaining aggravating circumstances (without the prior conviction of a violent felony) against the mitigating evidence presented. *Id.* at 11. The U.S. Supreme Court held that "the other relevant evidence presented by the State was sufficient to justify the imposition of the death sentence." *Id.* at 13.

Thus, the court in *Romano* found that "[t]he infirmity identified in *Caldwell* is simply absent in this case: Here, the jury was not affirmatively misled regarding its role in the sentencing process. The evidence at issue was neither false at the time it was admitted, nor did it even pertain to the jury's role in the sentencing process." *Id.* at 9.[21]

Here, the jury found future dangerousness *and* vileness – either of which sufficiently supports a death sentence under Va. Code § 19.2-264.2.[22] (J.A.II at 6369–71,

---

[21] The U.S. Supreme Court in *Romano* found that the petitioner's argument in that case

> seems to be a request that we fashion general evidentiary rules, under the guise of interpreting the *Eighth Amendment*, which would govern the admissibility of evidence at capital sentencing proceedings. We have not done so in the past, however, and we will not do so today. The *Eighth Amendment* does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings.

*Romano*, 512 U.S. at 11–12 (citing *Payne v. Tennessee*, 501 U.S. 808, 824–25 (1991); *Blystone v. Pennsylvania*, 494 U.S. 299, 309 (1990). Similarly, if this Court were to adopt Prieto's argument in this case, it would have to improperly disregard Virginia's rules of evidence with respect to capital sentencing.

[22] Va. Code § 19.2-264.2 states:

6372–74.)  Prieto does not contest any of the jury instructions given.  Like in *Romano*,

the jury in this case found multiple aggravating factors and was properly instructed

before beginning deliberations.[23]  Unlike in *Romano*, Prieto's prior convictions and death

sentence have not been vacated – nor is there any expectation that they will be for the

reasons discussed *supra* in Claim VIII.  Thus, contrary to Prieto's argument, *Romano*

supports the trial court's decision to admit the California convictions and death sentence

in this case.  For the foregoing reasons, the trial court did not err in admitting the

California convictions and death sentence.  Claim IX is dismissed.

### D.  Alleged Improper Admission of Victim Impact Evidence from Lisa Barajas–Claim XI

In Claim XI, Prieto challenges what he characterizes as irrelevant victim impact

testimony from Lisa Barajas who "testified to events that took place in California in 1990

---

In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

[23] For example, the jurors in this case were instructed about their role as "the judges of the facts, the credibility of the witnesses, and the weight of the evidence." (J.A.II at 6349.) They were properly instructed that in order to find a death sentence appropriate, "the Commonwealth must prove beyond a reasonable doubt and the jury must find unanimously one or both of the . . . aggravating circumstances." (J.A.II at 6351, 6353.) The jury was also instructed that it may consider Prieto's California death sentence "on the issue of whether there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society." (J.A.II at 6362.) The jury was even instructed: "the fact that Mr. Prieto has been sentenced to death in California does *not* diminish the importance of your decision here.  You are to render a decision according to the dictates of your individual consciences." (*Id.*) (emphasis added).

in which she, her mother [E.D.] and [Y.W.] were kidnapped and raped by Prieto and two

other men, and [Y.W.] was murdered." *Prieto II*, at 169.  The Commonwealth introduced

Barajas's testimony in order to prove the future dangerousness aggravator necessary for a

capital sentence.  Prieto, however, complains that "it was not he, but his co-defendant,

Mr. Estrada, who had raped and assaulted Ms. Barajas." (§ 2254 Pet. 69.)  Prieto

contends that "Barajas'[s] testimony [regarding her rape] and the photograph of her

injuries were highly prejudicial and wholly lacking in any probative value, in that her

violent assault and the resulting injuries [were] committed by Estrada, not Prieto." (§

2254 Pet. 70.)  Prieto insists the "extraordinarily prejudicial nature" of Barajas's

testimony so outweighed its probative value that its admission denied him a fair trial.

(*Id.*)

As explained below, Barajas's testimony was highly relevant to proving the future

dangerousness aggravating factor.  The whole of Barajas's testimony reflects that Prieto

exercised a leadership role in the crimes against Barajas, E.D., and Y.W.[24]

Barajas testified that E.D., Y.W., and herself were abducted by Prieto.  (J.A.II at

23717–18.)  At gunpoint, Prieto forced Barajas to give him her money and keys and

forced the three women to get in the back seat of Barajas's car.  (J.A.II at 23718.)  Before

Prieto drove off, two additional men sat down in the front seat of the car with Prieto.

---

[24] The circumstances of the crimes in California are part of the case in aggravation the Virginia
jury considered in imposing a sentence of death.  These circumstances also are relevant to the
prejudice inquiry with respect to Prieto's claims of ineffective assistance of counsel regarding
the presentation of mitigating evidence at sentencing.  *See Wiggins*, 539 U.S. at 534 ("In
assessing prejudice, we reweigh the evidence in aggravation against the totality of available
mitigating evidence.").

(J.A.II at 23719.)  Prieto told the three women in the back seat to put their heads between their legs and not to look up.  (J.A.II at 23718.)

One of the men, later identified as Vincent Lopez, said he "want[ed] nothing to do" with hurting the women, he was "just there to rob . . . people," and exited the vehicle. (J.A.II at 23719–20.)  Prieto then went to find someone more amenable to the plans he had for his captives.  Prieto drove to a different location and asked for a man referred to as "Diablo."  (J.A.II at 23720.)  Thereafter, another man got in the car.  (J.A.II at 23720.)[25]  Prieto then drove to a field.  (J.A.II at 23722.)

When they arrived at the field, Prieto ordered the women to get out of car.  (J.A.II at 23722.)  Prieto took E.W. behind an abandoned building where she cried for help until her cries were cut short by a gunshot.[26]  (J.A.II at 23723, 23729.)

While E.W. cried for help, Estrada raped Barajas and then stabbed her.  (J.A.II at 23729–30.)  After Prieto shot E.W., Prieto came over to Estrada and asked him if he had killed Barajas.  (J.A.II at 23730.)  In response to Prieto's query, Estrada stabbed Barajas again and then kicked her.  (J.A.II at 23732.)  Barajas testified: "I laid there and I was -- as hard as it was, I had dirt in my mouth and in my nose, I laid there and I pretended I was dead while the guy that stabbed me, kicked me and kicked me in the stomach . . . ." (J.A.II at 23732.)  Prieto remained by Estrada as Estrada kicked Barajas.  (J.A.II at 23733.)

[25] The man who got into the car was Estrada.  *Prieto*, 30 Cal. 4th at 239.  Estrada later raped Barajas.  *Id.* (J.A.II at 23730.)

[26] The prosecution introduced additional evidence that reflected Prieto had placed his gun near the top of E.W.'s head, shot her through the top of her head, and the bullet had come to rest near her chin.  (J.A.II at 23683–84.)

Barajas's testimony indicated that Prieto had acted as the leader of the crimes. She explained that Prieto gave orders to the other men and they would follow through with his orders. (J.A.II at 23737.)

In rejecting this claim, the Supreme Court of Virginia found:

> Barajas' testimony . . . was highly relevant to Prieto. Barajas indicated that the three men worked together in a coordinated effort to commit the offenses. Although she mentioned her own rape and that she was bitten during it, a review of her testimony reveals that it was narrowly tailored to describing the general events and Prieto's involvement in the crimes. In fact, the most inflammatory remarks, during which she described lying in the dirt pretending to be dead waiting to be stabbed, are in fact those most directly related to Prieto: she recounted him having a conversation with her rapist and asking her primary attacker whether he had killed her yet. Her testimony was thus highly probative as to the future dangerousness aggravating factor, and it cannot be said that the circuit court abused its discretion in allowing the testimony.

*Prieto II*, at 170–71.

Prieto's contention that there was a "lack of a direct link" between Barajas's description of the crimes against her person and the issue of his future dangerousness is specious. (§ 2254 Pet. 69.) The Supreme Court of Virginia reasonably concluded Barajas's testimony was "highly probative" as to the issue of future dangerousness. *Prieto II*, at 171. Although Prieto did not rape Barajas, he recruited the individual who did, after another man refused to participate in hurting the women. Moreover, Prieto prompted Barajas's assailant to stab and kick her to ensure that she was dead. Prieto fails to demonstrate the court's rejection of this claim rests upon an unreasonable finding of fact or constitutes an unreasonable application of U.S. Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1)–(2). Claim XI is dismissed.

**X. Alleged Error With Respect to Testimony from Velda Jefferson–Claim XII**

Claim XII concerns Prieto's alleged participation in the rape and murder of Veronica Jefferson.[27] "Veronica was found dead and partially naked in a school yard in 1988 at the age of 28, an apparent victim of rape and murder." *Prieto II*, at 171. Many years later, "a DNA profile implicated Prieto [in those crimes]. Detectives and forensic officers were brought forward to testify to the actual circumstances of the murder and the discovery of DNA evidence from a vaginal swab of Veronica." *Id.*

In Claim XII, Prieto contends that the circuit court "improperly permitted Velda Jefferson to offer victim-impact testimony regarding the unajudicated murder of [her daughter,] Veronica Jefferson . . . ." (§ 2254 Pet. 71.) Prieto, however, largely fails to identify the constitutional right at issue.[28] At best, Prieto suggests that Velda Jefferson impermissibly offered victim impact evidence about the unadjudicated murder of her daughter. (§ 2254 Pet. 71 (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).) As explained below, the Supreme Court of Virginia acted reasonably in rejecting this claim because Velda Jefferson's limited testimony was offered, not as victim impact testimony, but to rebut any suggestion that her daughter had engaged in consensual sexual activity with Prieto.

Velda Jefferson testified that at the time of her daughter's murder, her daughter was in a committed relationship with a medical student, who had given her a ring. (J.A.II

---

[27] At the time of Prieto's 2010 sentencing, Prieto had been accused, but not convicted of the 1988 murder of Veronica Jefferson.

[28] Prieto's arguments with respect to the improper admission of Velda Jefferson's testimony largely rely upon Virginia law. (§ 2254 Pet. 70–71.) Such arguments provide no basis for federal habeas corpus relief. *Penry v. New Hampshire*, 132 S. Ct. 716, 720 (2012).

at 23401.)  Velda Jefferson further testified that she spoke with Veronica "about once a week," (J.A.II at 23401), and Veronica "[n]ever" mentioned the name Alfredo Prieto. (J.A.II at 23407.)  The Supreme Court of Virginia accepted the Commonwealth's explanation "that the mother's testimony was offered not as victim impact testimony but rather to show that it was unlikely that any sexual contact with Prieto was consensual." *Prieto II*, at 171.  The court then concluded that "[i]t was certainly within the purview of the circuit court to admit this factual testimony."  *Id.*  Prieto fails to demonstrate that such a ruling rests upon an unreasonable finding of fact or constitutes an unreasonable application of U.S. Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1)–(2).  Claim XII is dismissed.

## XI. Dr. Samenow's Examination of Prieto–Claim XIV

Prieto argues the scope of Dr. Stanton E. Samenow's mental health examination of him, conducted pursuant to Va. Code § 19.2-264.3:1, violated his Fifth Amendment rights.  Prieto further contends that the trial court erred in allowing Dr. Samenow to testify that Prieto failed to cooperate during his examination.  The Supreme Court of Virginia considered these claims and reasonably rejected them.  28 U.S.C. § 2254(d)(1)-(2); *Schriro*, 550 U.S. at 473 (citing *Williams*, 529 U.S. at 410).

First, this Court considers Prieto's contention with respect to the scope of the mental health examination of Prieto, which was conducted by Dr. Samenow upon the Commonwealth's request.  Prieto argues that unless he had put his mental state at the time of the offense at issue, the Commonwealth cannot credibly claim any rebuttal right to an examination that would supersede his right to remain silent under the Fifth

Amendment. The Court begins its analysis by noting that Prieto does not contest the constitutionality of Va. Code § 19.2-264.3:1 – which provides for a mental health evaluation when a defendant's mental condition is relevant to a capital sentencing. Thus, this Court is bound by the Supreme Court of Virginia's construction of the statute as a matter of law. *O'Brien v. Skinner*, 414 U.S. 524, 531 (1974) ("[I]t is not our function to construe a state statute contrary to the construction given it by the highest court of a State."); *California v. Freeman*, 488 U.S. 1311, 1313 (1989) (citing *O'Brien*, 414 U.S. at 531) ("Interpretations of state law by a State's highest court are, of course, binding upon the United States Supreme Court.").

Virginia Code § 19.2-264.3:1 allows defendants to use the evaluation to address their mental health history and state at the time of the offense. Specifically, Va. Code § 19.2-264.3:1(A) (hereinafter "subsection (A)") allows an indigent capital defendant to move for appointment of mental health experts to evaluate the defendant and assist the defense in preparation of information with respect to the:

> defendant's history, character, or mental condition, including (i) whether the defendant acted under extreme mental or emotional disturbance at the time of the offense; (ii) whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was significantly impaired at the time of the offense; and (iii) whether there are any other factors in mitigation relating to the history or character of the defendant or the defendant's mental condition at the time of the offense.

Virginia Code § 19.2-264.3:1(F) (hereinafter "subsection (F)") offers a reciprocal right to the Commonwealth, who may then request "an evaluation concerning the

existence or absence of mitigating circumstances relating to the defendant's mental condition *at the time of the offense. . ."* (emphasis added).

Prieto exercised his right under subsection (A) and was evaluated by Dr. Mark Cunningham. The Commonwealth moved to appoint Dr. Samenow to evaluate Prieto, pursuant to the reciprocal right offered under subsection (F). Prieto objected, arguing that Dr. Samenow was biased toward mitigation. (J.A.II at 5759–65.) Prieto also filed a "Memorandum Concerning Scope of Evaluation by Dr. Samenow," in which defense counsel argued that if Dr. Samenow is permitted to evaluate Prieto, his evaluation should be limited – such that he may not question Prieto about the underlying offense conduct, the offenses in California, and any other unadjudicated offenses. (J.A.II at 6074–82.) The trial court appointed Dr. Samenow over the defense objection, and overruled Prieto's motion to limit Dr. Samenow's evaluation after hearing extensive argument on the matter. (J.A.II at 6069, 19744–746.)

Prieto alleges that he limited his proposed mitigation evidence to his history and character and invoked his right to remain silent with respect to the criminal charges pending against him. By conditioning the admission of Prieto's mitigating evidence related to his history and character on his willingness to abandon his Fifth Amendment rights and discuss his mental state at the time of the offenses, Prieto argues the trial court applied Va. Code § 19.2-264.3:1 unconstitutionally.[29] Prieto argues that unlike subsection (A), the right under subsection (F) does not expressly encompass information

---

[29] Prieto contends that given the necessity of mitigation evidence to a capital defendant, *see, e.g.*, *Wiggins*, 539 U.S. at 510, the trial court's refusal to limit Dr. Samenow's examination presented an impossible choice for Prieto.

concerning the defendant's history, character, or mental condition at times *other* than that of the charged offense.

While Prieto is correct that subsection (F) does not overtly encompass that information about the defendant's mental health history, Virginia courts have clearly held that subsection (F) examinations may cover such matters. Thus, this Court finds that the Supreme Court of Virginia reasonably held "that the circuit court did not err in allowing Dr. Samenow to question Prieto about the underlying offenses, because Prieto waived his Fifth Amendment rights when he gave notice of his intention to use his mental health expert's evaluation as mitigating evidence." *Prieto II*, at 177. The court appropriately based its decision on *Savino v. Commonwealth*, 239 Va. 534 (1990), *cert. denied*, 498 U.S. 882 (1990).

Prieto argues the Supreme Court of Virginia incorrectly viewed *Savino*[30] as analogous to Prieto's circumstances.[31] The court in *Savino* held that if a defendant gives notice that he intends to present evidence of his mental condition for use in mitigation under subsection (A), he waives his Fifth Amendment privilege as it pertains to

---

[30] Prieto also relies on a Prince William County Circuit Court case, *Commonwealth v. John Muhammad*, which is not binding upon this Court. (J.A.II at 19692–95, 19698–701.)

[31] Before the trial court ruled on the scope of Dr. Samenow's testimony, it acknowledged that this might be a question of first impression, and pressed the Commonwealth for cases controlling the issue. (J.A.II at 19705–706.) The Commonwealth argued that the Virginia Code speaks for itself and that *Savino* governs. (J.A.II at 19706, 19709.) The trial court ultimately ruled in favor of the Commonwealth. (J.A.II at 19744–19747.) Thus, it is unclear whether the trial court concluded that this issue is one of first impression or what it precisely relied on in its decision. Accordingly, the Court does not attach weight to Prieto's contention that the trial court viewed the issue as one of first impression. This Court's research indicates that the Supreme Court of Virginia's interpretation of Va. Code § 19.2-264.3:1 in *Savino*, directs this Court's ruling on the issue.

psychiatric testimony. *Id.* at 543–44. In that case, the Commonwealth's doctor "opined that Savino 'show[ed] signs of future dangerousness in view of his past criminal history so that he would have a high probability of committing criminal acts of violence that would constitute a continuing serious threat to society in the future.'" *Id.* at 543.

Prieto stresses that the court in *Savino* recognized a distinction between a mental-status defense (with well-settled law that defendant waives Fifth Amendment rights) and more generalized mitigation in sentencing. The *Savino* court distinguished between these two circumstances, but it clearly held that in the circumstances (which are akin to those in the case at bar) where a defendant initiates his mental health examination under subsection (A) and provides notice to the Commonwealth, he waives his Fifth Amendment right when he is examined under subsection (F). *Id.* at 543–44.

Prieto is correct that the defendant put both mitigation and mental-status defense at issue in *Savino*. However, the court stated "it was Savino who first requested the mental examination and gave notice of his intention to use the expert's evaluation as mitigating evidence. We hold, therefore, that Code § 19.2-264.3:1 does not violate Savino's fifth amendment right." *Id.* at 544. Thus, the Supreme Court of Virginia has not limited its holding in *Savino* to circumstances in which the defendant puts both mitigation and mental-status defense at issue. Moreover, the court accurately explained "*Savino*'s rationale [has been extended] to hold that Code § 19.2-264.3:1(F) 'do[es] not limit the scope of the expert's examination to matters of mitigation' and that therefore the Commonwealth's mental health expert may evaluate a defendant's future dangerousness." *Prieto II*, 176–77 (quoting *Stewart v. Commonwealth*, 245 Va. 222,

243, *cert. denied*, 510 U.S. 848 (1993)). Therefore, the Supreme Court of Virginia properly relied on *Savino* to determine the trial court did not err in permitting Dr. Samenow's testimony.

Prieto also relies on *Estelle v. Smith*, 451 U.S. 454 (1981), which he acknowledges is factually distinguishable from his case, but argues that it stands for the proposition that values inherent in the Fifth Amendment attach in psychological evaluations. Prieto unpersuasively argues the Supreme Court of Virginia erred under *Estelle*.

The U.S. Supreme Court in *Estelle*, affirmed an order vacating the defendant's death sentence because he was not notified of his Fifth Amendment right to remain silent when the state's psychiatrist evaluated him before sentencing, where the defendant did not initiate the evaluation and did not introduce psychiatric evidence. *Estelle*, 451 U.S. at 462. Prieto's case is distinguishable because by his own choice, Prieto introduced psychiatric evidence. Moreover, while *Estelle* may show that the Supreme Court attaches some Fifth Amendment rights to psychiatric evaluations, it does not follow that the Fifth Amendment applies in the particular circumstances at issue in this case – circumstances that the Supreme Court of Virginia in *Savino* and other cases, has expressly held the Fifth Amendment does not apply. Moreover, the Supreme Court of Virginia plainly rejected reliance on *Estelle* for the proposition that mental health examinations under Va. Code § 19.2-264.3:1 violate the Fifth Amendment when they are conducted upon the Commonwealth's subsection (F) reciprocal right. *Savino*, 239 Va. at 543–44.

The Court now turns to Prieto's argument with respect to Dr. Samenow's testimony about Prieto's failure to cooperate during his examination. Dr. Samenow

described Prieto's behavior in negative terms ("difficult" and "testy"). (J.A.II at 25654–655.) Prieto argues that this is prejudicial, and contends that he fully cooperated within constitutional limits. Prieto contends the Supreme Court of Virginia unreasonably applied federal law under *Estelle* by opining that Prieto waived his Fifth Amendment rights and, thus, subsequent comment was acceptable.

However, the Supreme Court of Virginia reasonably rejected Prieto's argument when it reasoned that:

> a defendant waives his Fifth Amendment rights when he gives notice of his intention to use his mental health expert's evaluation as mitigating evidence. Second, the record fully supports the circuit court's finding that "there was a partial failure to cooperate" on Prieto's part during Dr. Samenow's evaluation. Accordingly, we conclude that the circuit court did not err in allowing Dr. Samenow to testify about Prieto's "refusal to cooperate" during the evaluation, in accordance with Code § 19.2-264.3:1(F)(2).

*Prieto II*, at 177.

The record supports the Supreme Court of Virginia's finding. Dr. Samenow testified that Prieto was uncooperative in discussing the crimes – "particularly in areas where he might appear in an unfavorable light" – and that he was "vague from time to time," "testy," and evasive. (J.A.II 25654–656, 25772.) The trial court found Prieto was uncooperative in answering questions on these topics. (J.A.II 24262.)

Moreover, Va. Code § 19.2-264.3:1(F)(2) provided notice to Prieto of his Fifth Amendment waiver, and of the consequence of failure to cooperate with the Commonwealth's examination. *See Juniper v. Commonwealth*, 271 Va. 362, 409–10 (2006), *cert. denied*, 549 U.S. 960 (2006) (affirming "sanction" of informing the jury the

defendant had failed to cooperate with the Commonwealth's mental health expert as provided for in Va. Code § 19.2-264.3:1(F)(2)).

For all these reasons, this Court agrees with the Supreme Court of Virginia that the trial court did not err in permitting Dr. Samenow to testify about Prieto's failure to cooperate fully with his examination.

Having found that the trial court did not err in either of the two aspects of Prieto's Claim XIV, this Court dismisses Claim XIV.

## XII. Alleged Ineffective Assistance of Counsel with Respect to Mitigating Evidence

### A.  Alleged Inadequate Development and Presentation of Mitigating Evidence Generally–Claim III

In Claim III, Prieto faults counsel for failing to present a host of mitigating evidence during the 2010 sentencing and for failing to explain the connection between "Prieto's history and background and his resultant behavior and symptomology." (§ 2254 Pet. 25.)  Specifically, Prieto faults counsel for failing to present: "evidence of Prieto's right frontal lobe dysfunction and temporal lobe damage" (*id.* at 29);  evidence that Prieto "exhibited behaviors and symptoms consistent with this longstanding organic brain damage" (*id.* at 31); "broad evidence of Prieto's intellectual disability" (*id.* at 32); and, "compelling evidence available from lay and expert witnesses regarding the *specific and debilitating effects* . . . trauma had on Prieto (*id.* at 33).  As explained below, contrary to Prieto's assertions, much of the evidence Prieto faults counsel for omitting was actually presented at sentencing, albeit in a slightly different manner.

Initially, Prieto asserts counsel failed to present evidence of Prieto's right frontal lobe dysfunction and temporal lobe damage, which he asserts had been confirmed by a positron emission tomography ("PET") scan. (§ 2254 Pet. 29.) The Supreme Court of Virginia made the following pertinent findings in disposing of this aspect of the claim,

> [C]ounsel presented evidence of Prieto's PET scan during the sentencing phase of Prieto's 2008 trial.   Although Prieto's expert, Dr. James Merikangan, testified that the scan showed Prieto suffered from organic brain damage, Dr. Merikangan's opinion was impeached by the report of Dr. Michael Kistler, the doctor who conducted the PET scan.  Dr. Kistler opined that Prieto did not have organic brain damage and that his scan was "normal."
>
> Counsel, having had the opportunity to present the PET scan evidence and to evaluate the strength of the Commonwealth's contrary evidence and the effect of the evidence on the jury, could reasonably have determined that presenting the same evidence at Prieto's second sentencing hearing would not be prudent.  Such tactical decisions are an area of trial strategy left to the discretion of counsel and should not be second-guessed in a habeas corpus proceeding.

*Prieto III*, at 108 (citing *Strickland*, 466 U.S. at 689–90).

Moreover, "counsel did present evidence at Prieto's 2010 trial that Prieto suffered from organic brain damage." *Id.* at 108.  Specifically, "[c]ounsel presented testimony from Dr. James Garbarino that the results of the type of long-term trauma Prieto experienced as a child included poor brain development, and from clinical and forensic psychologist Dr. Mark Cunningham, who opined that Prieto's low IQ was an indicator of brain damage." *Id.* (spelling corrected).  Initially, counsel presented an abundance of evidence of the prolonged trauma Prieto experienced in El Salvador as a child.  Dr. Garbarino then related how trauma of the ilk experienced by Prieto could result in "actual physical changes to the development of the brain," including the part of the brain "used in

reasoning and decision making." (J.A.II at 24354.) Dr. Garbarino then explained that children regularly exposed to violence "develop a kind of de-sensitization to violence" which makes such children "much more likely to go out and just use violence as a technique in getting along in the world." (J.A.II at 24355.) Dr. Garbarino explained that he offered the foregoing testimony "as an explanation of how they get from being a vulnerable child to being a violent man. It's not an excuse, it's an explanation of the process." (J.A.II at 24365.)

Dr. Cunningham also indicated that Prieto had brain damage (J.A.II at 25294),[32] and that fact, in conjunction with abandonment and instability in the home, inclined a person toward bad behaviors (J.A.II at 25280). Dr. Cunningham further explained that the sort of trauma to which Prieto had been exposed "contributes to inadequate self control." (J.A.II at 25410.) Dr. Cunningham concluded that all the factors which make up Prieto's background, "deficient intelligence, abandonment," (J.A.II at 25425), et cetera, put Prieto "gravely at risk for [committing] violent crime later in life at that time in his teen years and in his early adulthood." (J.A.II at 25427.)

Thus, contrary to Prieto's assertions, counsel presented evidence of Prieto's intellectual impairment that he faults counsel for omitting.[33] Additionally, as noted above

---

[32] Dr. Cunningham further stated that, "chronic trauma exposure in childhood is actually altering the architecture, the physical status of the brain, the chemical reactions that are taking place . . . . It results in individuals . . . . [t]hat are at increased risk . . . for criminal offending . . . ." (J.A.II at 25357–58.)

[33] Prieto asserts that counsel failed to introduce evidence that Prieto "exhibited behaviors and symptoms consistent with this longstanding organic brain damage" (§ 2254 Pet. 31) and "broad evidence of Prieto's intellectual disability" (*id.* 32). However,

and elaborated on below, counsel presented expert testimony explaining how Prieto's mental deficits and the impact of childhood trauma pushed Prieto to commit aberrant behavior.

For example, Prieto faults counsel for failing to present evidence demonstrating that Prieto continued to suffer from the trauma he experienced as a child, that such trauma pushed him toward committing criminal acts, and diminished his moral culpability. (*See, e.g.*, § 2254 Pet. 33–36.) In rejecting this aspect of the claim, the Supreme Court of Virginia noted,

> At Prieto's 2010 trial, counsel presented the testimony of Dr. Cunningham. Dr. Cunningham opined that Prieto did suffer from [Post Traumatic Stress Disorder, ("PTSD")] caused by his childhood exposure to "scenes of recurrent horror" during the El Salvadorian civil war. In addition, Dr. Cunningham suggested that Prieto suffered from a number of other deficits, including the results of chronic, long-term trauma, and opined that these deficits caused Prieto to lack self-control, inured him to violence, and prevented him from appreciating the pain he might inflict. Dr. Cunningham conceded Prieto's outward appearance might not show signs of PTSD but explained that his experience of chronic trauma enabled him to present an outward appearance of being calm and comfortable with the past while his psyche remained disturbed by it.

*Prieto III*, at 110. In essence, Prieto critiques counsel for failing to present different evidence regarding the impact of trauma to Prieto. (*See* § 2254 Pet. 33–36.) However, as the Supreme Court of Virginia observed, counsel had presented evidence of Prieto's

---

> [t]he record, including the trial transcript, demonstrates that in addition to the expert testimony supporting Prieto's claim that he suffered brain damage, counsel presented anecdotal evidence at Prieto's 2010 trial that Prieto was slower and more reserved than other children, that he experienced nightmares as a child, and that he was scared of the violence he and his siblings had seen on a regular basis.

*Prieto III*, at 109.

PTSD at the 2008 sentencing and counsel was in the best position "to evaluate Prieto's appearance at trial relative to the description of the effects of his PTSD, and to evaluate the effect [or lack of effect] of the evidence on the jury." *Prieto III*, at 110. In this regard, counsel's decision to omit additional evidence of trauma and its effects on Prieto falls well within the bounds of constitutionally acceptable performance. Moreover, given the evidence counsel presented regarding trauma and Prieto's intellectual deficits and the evidence in aggravation,[34] Prieto fails to demonstrate a reasonable probability of a different result had counsel presented all of the evidence he describes in conjunction with Claim III. *See Tibbetts v. Bradshaw*, 663 F.3d 436, 445 (6th Cir 2011) (observing that the "brutality of [the petitioner's] crimes would have completely overwhelmed any additional, cumulative mitigation evidence of [the petitioner's] difficult childhood"). Because the Supreme Court of Virginia's rejection of this claim was reasonable, this Court dismisses Claim III.

## B.   Alleged Inadequate Presentation of Mitigating Evidence with Respect to Relative Culpability—Claim IV

In Claim IV, Prieto asserts that counsel "unreasonably failed to develop and present evidence at Prieto's 2010 trial that the presence and participation of another perpetrator at the time of the crimes diminished Prieto's culpability for the murders of

---

[34] In addition to the evidence of Prieto's other crimes, the Commonwealth directed the jury's attention to evidence indicating Prieto's murder and rape of Raver were particularly vile. Raver was killed by a gunshot wound to the back. *Prieto I*, at 378. However, when the police discovered Raver's mostly naked body, she was lying on her back some distance from where her discarded clothes were found. *Id.*; (J.A.II. 27237). Based on these facts, and evidence from the crime scene, the prosecution convincingly argued that Prieto forced Raver to disrobe and after she partially disrobed, Raver fled from Prieto. (J.A.II at 25883–84.) Prieto then shot Raver through the back and raped her as she was dying. (J.A.II at 25886.)

Raver and Fulton." (§ 2254 Pet. 40.) In support of Claim IV, Prieto revisits the allegations he made in Claim I with respect to counsel's allegedly deficient investigation of forensic evidence indicating the presence of second perpetrator. For reasons stated *supra* in conjunction with the dismissal of Claim I, Prieto fails to demonstrate any deficiency on the part of counsel in his investigation and presentation of forensic evidence of an alleged second perpetrator.

Prieto further asserts that counsel

failed to develop, present, and argue that mitigation evidence painted a picture of Prieto's subordinate role in the crime. Evidence of Prieto's intellectual disability, his organic brain damage associated with deficits in executive functioning, and the lasting effects of trauma on Prieto's behavior, all supported the argument that another, more culpable, person committed the crime with Prieto.

(§ 2254 Pet. 42 (citation omitted).) Given the general absence of any significant evidence of another perpetrator and the compelling evidence that Prieto was more than capable of committing this crime alone,[35] counsel reasonably eschewed devoting too much time to this line of defense. Moreover, no reasonable probability exists that had counsel advanced the evidence and arguments Prieto urges here that he would have avoided a sentence of death. Accordingly, Claim IV is dismissed.

---

[35] As noted above, Lisa Barajas had provided compelling, unequivocal evidence that Prieto acted as a leader, rather than as a subordinate, in the group of men that had abducted her. (J.A.II at 23737.) Additionally, the jury had heard evidence that indicated that Prieto had raped and murdered Veronica Jefferson by himself. (J.A.II 23419–28, 23452–56, 23598–23607.)

## XIII.  Whether Prieto's Execution is Barred by *Atkins v. Virginia*–Claim V

Prieto alleges that he is intellectually disabled and argues his execution is, thus,

barred under *Atkins v. Virginia*.  The U.S. Supreme Court in *Atkins* held that it is

unconstitutional under the Eighth Amendment to execute a intellectually disabled

person.[36]  536 U.S. 304, 321 (2002).  As explained *supra*, this claim is procedurally

defaulted because Prieto did not raise it below.  Absent a showing of cause and prejudice

or a fundamental miscarriage of justice, this Court cannot review the merits of a defaulted

claim.  *See Harris*, 489 U.S. at 262.  Prieto fails to establish that either of these

exceptions to procedural default apply.

First, as discussed *infra* in Part XIV, Prieto has not established that trial counsel

was ineffective in failing to present evidence that he is intellectually disabled at the 2010

sentencing.  Thus, Prieto has not shown cause and prejudice, permitting this Court to

excuse the procedural default of Claim V.  *Id.*

### A.     Application of Fundamental Miscarriage of Justice to an *Atkins* Claim

Second, Prieto argues that this Court should consider Claim V even though it is

procedurally defaulted because he is actually innocent of the death penalty since he is

intellectually disabled, and may not be sentenced to death under *Atkins*.  *Buckner v. Polk*,

453 F.3d 195, 199 (4th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986))

("Habeas petitioners may use an actual innocence claim to excuse the procedural default

of a separate constitutional claim upon which they request habeas relief.").  Specifically,

---

[36] Given the U.S. Supreme Court's latest guidance in *Hall v. Florida*, 134 S. Ct. 1986, 1990 (May 2014), the Court will use "intellectual disability" to describe "mental retardation."  This Court will use "intellectual disability" to mean "mental retardation" throughout this opinion, except when quoting testimony or case law that employ the term "mental retardation."

Prieto argues that "[i]f preventing a retarded petitioner from obtaining meaningful review of a death sentence is not a miscarriage of justice, we cannot conceive of what is." (Pet'r's Resp. to Resp't's Mot. Dismiss 5.)

The "fundamental miscarriage of justice exception" permits review of otherwise procedurally barred claims only in those "extraordinary instances" where the petitioner "makes a proper showing of actual innocence." *Turner v. Jabe*, 58 F.3d 924, 931–32 (4th Cir. 1995) (citations omitted) (internal quotation marks omitted). The U.S. Supreme Court has extended the fundamental miscarriage of justice exception to claims of capital sentencing error. *See Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). The court acknowledged "that the concept of 'actual innocence' did not translate neatly into the capital sentencing context," and "limited the exception to cases in which the applicant could show 'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Sawyer*, 505 U.S. at 336) (some internal quotations omitted).

Some courts – not including the U.S. Supreme Court or the U.S. Court of Appeals for the Fourth Circuit – have concluded that a petitioner may satisfy the actual innocence exception if the petitioner demonstrates he is ineligible for the death penalty under *Atkins* because of his mental disability. *See Rocha v. Thaler*, 626 F.3d 815, 826 & n.45 (5th Cir. 2010) (citing *Moore v. Quaterman*, 491 F.3d 213, 230 (5th Cir. 2007) (Dennis, J., dissenting)); *Sasser v. Norris*, 553 F.3d 1121, 1125–26 (8th Cir. 2009), *abrogated on other grounds*, *Wood v. Milyard*, 132 S. Ct. 1826, 1834 (2012); *Winston v. Kelly*, 600 F.

Supp. 2d 717, 735–36 (W.D. Va. 2009), *rev'd on other grounds*, 592 F.3d 535 (4th Cir. 2010).

This Court notes that on June 18, 2014 it ordered the parties to provide supplemental briefing "providing legal authority for [Prieto's] position that the Court may review his defaulted *Atkins* claim under a fundamental miscarriage of justice exception." (ECF No. 46.) The parties filed their supplemental briefs on that issue, among others. However, Prieto did not direct the Court to a single case in which the Fourth Circuit or the U.S. Supreme Court explicitly found that a petitioner may satisfy the actual innocence exception to procedural default if he demonstrates that he is ineligible for the death penalty under *Atkins*.

Nevertheless, out of an abundance of caution, the Court will examine whether Prieto has made a sufficient showing of intellectual disability so that the Court may excuse his default and reach the merits of his underlying *Atkins* claim.

**B.     Applicable Standard**

This Court applies a clear and convincing standard to evaluate Prieto's attempt to invoke the fundamental miscarriage of justice exception. In a June 18, 2014 Order, the Court ordered the parties to instruct it on what standard Prieto must satisfy to obtain relief on his defaulted *Atkins* claim. (ECF No. 46.) *Compare Martinez Ramirez v. Ryan*, No. CV–97–1331–PHX–JAT, 2010 WL 3854792, at *9 (D. Ariz. Sept. 28, 2010) ("assess[ing] whether Petitioner demonstrated by clear and convincing evidence that no reasonable factfinder would have determined that he is not mentally retarded"), *with*

*Winston*, 600 F. Supp. 2d at 735 n.18 (employing a similar standard, but only requiring a

preponderance of the evidence).

Prieto's brief merely repeated the cases provided by the Court in its Order, and

failed to offer persuasive argument as to why a preponderance standard should be applied

here – especially when the U.S. Supreme Court and Fourth Circuit have consistently

applied a clear and convincing standard in these circumstances. The Fourth Circuit

recently recited the appropriate standard in *United States v. Jones*, and noted "the stark

differences between claims involving actual innocence of a crime of conviction and

claims involving actual innocence of a capital sentence." 2014 U.S. App. LEXIS 13321

*15–16 (4th Cir. N.C. July 14, 2014). The court explained that "[i]nnocence of

conviction implicates the notion that a person has been incarcerated for a crime he did not

commit, whereas a sentencing error does not at all implicate guilt." *Id.* at *14. The U.S.

Supreme Court explained that

> a petitioner claiming actual innocence of his crime of conviction need only
> show that it is <u>more likely than not</u> that no reasonable juror would have
> found him guilty beyond a reasonable doubt in light of new evidence . . .
> whereas a petitioner claiming actual innocence of his capital sentence must
> show by <u>clear and convincing</u> evidence that, but for a constitutional error,
> no reasonable juror would have found him eligible for the death penalty
> (the standard from Sawyer).

*Jones*, 2014 U.S. App. LEXIS 13321, at *16 (citing *Schulp v. Delo*, 513 U.S. 298, 324

(1995)) (emphasis in the original). The clear and convincing standard was originally

announced in *Sawyer v. Whitley*, 305 U.S. 333, 336 (1992) (holding "that to show 'actual

innocence' one must show by clear and convincing evidence that, but for a constitutional

error, no reasonable juror would have found the petitioner eligible for the death penalty

under the applicable state law"). It is apparent that the U.S. Supreme Court and Fourth Circuit apply a clear and convincing standard.[37] As such, this Court will do the same.[38]

Finally, it must be remembered the present review is a level removed from *de novo* review of Prieto's *Atkins* claim. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (explaining that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations"). "Claims of actual innocence, whether presented as freestanding ones, or merely as gateways to excuse a procedural default, should not be granted casually." *Wilson v. Greene*, 155 F.3d 396, 404–05 (4th Cir. 1988) (internal citations omitted). An exception of actual innocence is "narrow [in] scope." *Calderon v. Thompson*, 118 S. Ct. 1489, 1503 (U.S. 1998).

## C.    Prieto's Gateway *Atkins* Claim

The Court has carefully and thoroughly reviewed the record and finds that Prieto has not shown by clear and convincing evidence that no reasonable juror would have

---

[37] The court in *Winston v. Kelly*, 600 F. Supp. 2d 717, 736, n.18 (W.D. Va. 2009) applied a preponderance standard to evaluate whether the petitioner had shown he was actually innocent of the death penalty because of his intellectual disability. However, the court expressly stated that it was assuming, but not deciding "that this more lenient burden applies as a result of the preponderance standard specified by the Virginia statute [that requires a defendant to prove at trial by a preponderance of the evidence that he is intellectually disabled such that he may not be sentenced to death]." *Id.* (citing Va. Code § 19.2-264.3:1.1). The court explicitly recognized that a clear and convincing standard is applicable to show actual innocence of the death penalty. *Winston*, 600 F. Supp. 2d at 736, n.18 (quoting *Sawyer*, 505 U.S. at 336, 347). Moreover, the court found that Winston did not satisfy the preponderance standard – even where there was *new* evidence of Winston's subaverage intellectual functioning, including a full-scale IQ score of 66, and adaptive behavior limitations. *Winston*, 600 F. Supp. 2d at 736. Accordingly, *Winston* does not dictate this Court's application of a standard here.

[38] Moreover, even if this Court were to apply a preponderance of the evidence standard, as Prieto argues it should, the Court reaches the same conclusion – Prieto fails to meet his burden to show that no reasonable juror would have sentenced him to death because he is intellectually disabled.

sentenced him to death because he is intellectually disabled. *Dretke*, 541 U.S. at 393

(quoting *Sawyer*, 505 U.S. at 336).  It is significant that the only jury to have made a final

determination on Prieto's intellectual disability (the jurors at the 2008 sentencing)

reviewed extensive evidence, heard lengthy argument on the subject, and concluded that

Prieto was not intellectually disabled.  (J.A.I at 8991, 15977–79.)  While that jury's

sentence was later vacated due to defective verdict forms, this Court considers that jury's

conclusion noteworthy – especially in light of the Court's independent review of the

record.

    Virginia defines intellectual disability for purposes of whether one can be

constitutionally executed in Va. Code § 19.2-264.3:1.1(A).  Specifically,

> "Mentally Retarded" means a disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code § 19.2-264.3:1.1(A).

    The Supreme Court of Virginia has held that 70 is the threshold IQ test score

"below which one may be classified as being mentally retarded." *Johnson v.

Commonwealth*, 267 Va. 53, 75 (2004), *vacated and remanded on other grounds*, 544

U.S. 901 (2005).  The U.S. Supreme Court recently held that such a bright line rule is

unconstitutional. *Hall v. Florida*, 134 S. Ct. 1986, 2000 (2014).  It further held that

"when a defendant's IQ test score falls within the test's acknowledged and inherent

margin of error, the defendant must be able to present additional evidence of intellectual

disability, including testimony regarding adaptive deficits." *Id.* at 2001. Thus, the court

held "an individual with an IQ test score 'between 70 and 75 or lower' may show

intellectual disability by presenting additional evidence regarding difficulties in adaptive

functioning." *Id.* at 2000 (quoting *Atkins*, 536 U.S. at 309 n.5.) Accordingly, it appears

that Virginia's threshold of 70 is unconstitutional under *Hall*, but that Va. Code § 19.2-

264.3:1.1(A) properly requires consideration of adaptive deficits.

However, it is unclear that *Hall* applies retroactively to collateral proceedings.

The U.S. Supreme Court and the Fourth Circuit have not yet ruled on that question. Yet

this Court's analysis under *Teague v. Lane*, 489 U.S. 288 (1989) reveals that *Hall* does

not apply retroactively. *See also In re Henry*, 2014 U.S. App. LEXIS 11398 at *20, 28

(11th Cir. June 17, 2014) (holding that "*Hall* did indeed announce a new rule of

constitutional law" which is not retroactive because it "merely provides new procedures

for ensuring that States do not execute members of an already protected group.").

*Hall* was decided on May 27, 2014, which is notably *after* June 14, 2010, when

Prieto's case became final for purposes of habeas review. *See Prieto v. Virginia*, 130 S.

Ct. 3419 (2010). "[A] new rule is not 'made retroactive to cases on collateral review'

unless the Supreme Court holds it to be retroactive." *Tyler v. Cain*, 533 U.S. 656, 663

(2001). Nothing in the *Hall* opinion indicates it was intended to be retroactive.

According to *Teague*, "[u]nless they fall within an exception to the general rule, new

constitutional rules of criminal procedure will not be applicable to those cases which

have become final before the new rules are announced." 489 U.S. at 310. The two

exceptions are that the new constitutional rules are substantive or "watershed" rules of criminal procedure. *Whorton v. Bockting*, 549 U.S. 406, 416 (2007).

In *Hall*, the U.S. Supreme Court unambiguously stated that "[t]he question this case presents is *how* intellectual disability must be defined in order to *implement* these [Eighth Amendment] principles and the holding of *Atkins*." *Hall*, 134 S. Ct. at 1993. (emphasis added). The court's ruling on this issue, as discussed *supra*, appears to have resulted in a procedural rule because it "regulate[s] only the *manner* of determining the defendant's culpability." *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) (emphasis added). Moreover, *Hall* does not announce a "'watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.'" *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997). Thus, "[t]he second, even more circumscribed, exception" does not apply. *Id.* "Since *Teague*, the Supreme Court has reviewed numerous claims that new rights fall within this exception, and it has rejected every single one of them." *United States v. Mathur*, 685 F.3d 396, 399 (4th Cir. 2012). This Court finds no compelling reason to apply the exception here.

Further, Prieto does not even suggest that *Hall* announces a substantive or watershed rule. He merely argues that *Hall* "can and should be applied retroactively," noting that "*Hall* expands the *Atkins* rules as it relates only to punishment." (Pet'r's Supplemental Br. at 5, ECF No. 42.) Prieto contends "retroactive application will not necessarily upset prior convictions, but solely the punishment;" and, thus, retroactive application of *Hall* would be "strictly contained." (*Id.*) However, the Supreme Court did

not expressly make *Hall* retroactive to cases on collateral review, nor does a *Teague* analysis require this Court to do so.[39]

While it appears that *Hall* does not apply retroactively in this case, the application of *Hall* would not change the Court's conclusion. In fact, a comparison of the facts in *Hall* with this case bolsters this Court's conclusion – given that Prieto introduced all of the evidence required by *Hall* and the fact that the circumstances in *Hall* are strikingly more compelling for a finding of intellectual disability than those in the case at bar.

Prieto alleges that "counsel and jurors were operating within the framework of an unconstitutional definition of retardation: one that included a bright line IQ threshold recently rejected in *Hall*." (Pet'r's "Directed Further Briefing" Br. at 5, ECF No. 47.) However, the 2008 jury was not instructed on a fixed score for determining intellectual disability. (J.A.I at 8920, 8922, 15977–979.) Further, the Court finds that under *Hall* and all relevant and controlling law, Prieto has failed to meet his burden to show by clear and convincing evidence that no reasonable juror would have sentenced him to death because he is intellectually disabled. *Dretke*, 541 U.S. at 393 (quoting *Sawyer*, 505 U.S. at 336).

---

[39] The Court notes that "[t]he relevant frame of reference . . . is not the purpose of the new rule whose benefit the [defendant] seeks, but instead the purposes for which the writ of habeas corpus is made available." *Teague*, 489 U.S. at 306 (internal citations omitted).

> "[T]he Court never has defined the scope of the writ simply by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error." . . . Rather, we have recognized that interests of comity and finality must also be considered in determining the proper scope of habeas review.

*Teague*, 489 U.S. at 308 (internal citations omitted). Here, it is appropriate to deny Prieto's request to retroactively apply *Hall* in light of the absence of any indication that the U.S. Supreme Court intended to do so; this Court's *Teague* analysis; and in the interest of comity and the finality of Prieto's judgment.

Accordingly, this Court analyzes whether it would be a fundamental miscarriage of justice to deny Prieto's *Atkins* claim within the framework of Va. Code § 19.2-264.3:1.1 – while using *Hall* as a helpful benchmark against which to weigh the various Virginia statutory factors.

### 1.   Significantly Subaverage Intellectual Functioning – Va. Code § 19.2-264.3:1.1(A)(i)

Prieto contends that he demonstrates "significantly subaverage intellectual functioning" under Va. Code § 19.2-264.3:1.1(A)(i). Pursuant to Va. Code § 19.2-264.3:1.1(B)(1),

> Assessment of intellectual functioning shall include administration of at least one standardized measure generally accepted by the field of psychological testing and appropriate for administration to the particular defendant being assessed, taking into account cultural, linguistic, sensory, motor, behavioral and other individual factors. Testing of intellectual functioning shall be carried out in conformity with accepted professional practice, and whenever indicated, the assessment shall include information from multiple sources. The Commissioner of Behavioral Health and Developmental Services shall maintain an exclusive list of standardized measures of intellectual functioning generally accepted by the field of psychological testing.[40]

Prieto presented evidence regarding the SEM for IQ tests and the range of his IQ scores. (J.A.I at 12650–62, 12704–10, 15287, 15292.) Specifically, Prieto relies on the testimony of Dr. Ricardo Weinstein, who opined at the 2008 trial that Prieto was intellectually disabled. (J.A.I at 12742.) Dr. Weinstein based his conclusion on his administering of the Escala Wechsler de Inteligencia Para Adultos III ("EWIPA III") IQ test, which is the Spanish (Mexican) version of the Wechsler Adult Intelligence Scale III

---

[40] The parties do not dispute whether the IQ tests administered meet the requirements of the Commissioner.

("WAIS III") IQ test, using American norms, and determination that Prieto's IQ was 66 (range from 63 to 71). (J.A.I at 12709–710.) Dr. Weinstein also testified that with the Flynn effect,[41] Prieto's true IQ score is between 60 and 68. (*Id.*) Dr. Weinstein emphasized that IQ scores have a range and are not "proof scores." (J.A.I at 12650.) In addition, Dr. Pablo Stewart testified that Prieto suffered from post-traumatic stress disorder as a result of his experiences in El Salvador. (J.A.I at 12952.) According to Prieto, all of this testimony supplies clear and convincing evidence that no reasonable juror would have sentenced Prieto to death because he is intellectually disabled. *Dretke*, 541 U.S. at 393 (quoting *Sawyer*, 505 U.S. at 336).

However, a jury heard all of the required evidence under Va. Code § 19.2-264.3:1.1(A) and *Hall*, and reasonably found otherwise. Prieto's evidence concerning his IQ score is not infallible. Prieto's own expert, Dr. Weinstein, conceded on cross-examination that when he scored the EWIPA III IQ test using the Mexican norms (instead of the American norms), the FSIQ was 75. (J.A.I at 13766.) Moreover, the Commonwealth relied on Dr. Leigh Hagan, who administered the WAIS III IQ test in May 2007 and found that Prieto scored a 73 (the SEM was 2.23 which led to a range between 69 – 78). (J.A.II at 24396–24408.)

Thus, the record indicates that the jury considered Prieto's IQ scores above *and* below 70, their ranges, and their SEMs. This evidence, coupled with evidence of Prieto's adaptive behavior, satisfies the requirements of Va. Code §§ 19.2-264.3:1.1(A), 19.2-

---

[41] The Flynn effect is the increase in the mean or average score on an intelligence test as time passes from the date the original test was normed.

264.3:1.1(B)(1), and *Hall* and support a reasonable conclusion that Prieto is not

intellectually disabled.

### 2.   Significant Limitations in Adaptive Behavior – Va. Code § 19.2-264.3:1.1(A)(ii)

The evidence of adaptive functioning – which Virginia requires under Va. Code §

19.2-264.3:1.1(A)(ii) and which the U.S. Supreme Court recently required in *Hall* –

overwhelmingly supports the conclusion that Prieto has not met his burden here.

Pursuant to Va. Code § 19.2-264.3:1.1(B)(2),

> Assessment of adaptive behavior shall be based on multiple sources of information, including clinical interview, psychological testing and educational, correctional and vocational records.   The assessment shall include at least one standardized measure generally accepted by the field of psychological testing for assessing adaptive behavior and appropriate for administration to the particular defendant being assessed, unless not feasible.   In reaching a clinical judgment regarding whether the defendant exhibits significant limitations in adaptive behavior, the examiner shall give performance on standardized measures whatever weight is clinically appropriate in light of the defendant's history and characteristics and the context of the assessment.

A comparison of the facts in *Hall* with Prieto's case reveals that Prieto's adaptive

behavior was not deficient under Va. Code §§ 19.2-264.3:1.1(A)(ii), 19.2-

264.3:1.1(B)(2), and *Hall*.

Although Hall had an IQ test score of 71, evidence of the significant limitations of

his adaptive functioning supported a finding of intellectual disability in that case. *Hall*,

134 S. Ct. at 1992.   Unlike Prieto, Hall did not act alone in his crimes.   Hall acted with an

accomplice, in kidnapping, beating, raping and murdering a woman and murdering a

sheriff's deputy. *Id.* at 1986.   "School records indicated that [Hall's] teachers identified

83

him on *numerous* occasions as "[m]entally retarded." *Id.* at 1990. (emphasis added). "Hall's counsel recalled that [he] could not assist in his own defense because he had 'a mental . . . level much lower than his age,' at best comparable to the lawyer's 4-year-old daughter." *Id.* at 1991. "A number of medical clinicians testified that, in their professional opinion, Hall was 'significantly retarded'; was 'mentally retarded'; and had levels of understanding 'typically [seen] with toddlers.'" *Id.* (internal citations omitted).

"Hall's siblings testified that there was something very wrong with him as a child. Hall was slow with speech and . . . slow to learn. He walked and talked long after his other brothers and sisters, and had great difficulty forming his words." *Id.* (internal citations omitted). "Hall was constantly beaten (by his mother) because he was slow or because he made simple mistakes. His mother would strap [Hall] to his bed at night, with a rope thrown over a rafter. In the morning she would awaken Hall by hoisting him up and whipping him with a belt, rope, or cord." *Id.* (internal citations omitted).[42]

The evidence of the limitations on Prieto's adaptive functioning is appreciably less than the limitations evident in *Hall*. Significantly, the jury in the case at hand heard extensive evidence regarding Prieto's adaptive functioning and made a reasonable conclusion that he was not intellectually disabled. The Court's own independent review of that evidence leads it to the same result – that Prieto has not met his burden to show by clear and convincing evidence that no reasonable juror would have sentenced him to

---

[42] "Yet the court also suspected that the defense experts were guilty of some professional overkill because nothing of which the experts testified could explain how a psychotic, mentally-retarded, brain-damaged, learning-disabled, speech-impaired person could formulate a plan whereby a car was stolen and a convenience store was robbed." *Id.*

death because he is intellectually disabled. *Dretke*, 541 U.S. at 393 (quoting *Sawyer*, 505 U.S. at 336).

Prieto argues that his adaptive behavior satisfies the threshold of Va. Code § 19.2-264.3:1.1(A)(ii), which requires "significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills." First, Prieto argues that his conceptual skills are lacking, as is evident in the fact that his family and friends noted that he had significant deficits in conceptual skills throughout childhood and adolescence (he was slow, immature, had the mind of a child, did not develop like other children, fell behind in school, was picked on at school, and had trouble with motor skills).

Next, Prieto contends that he had weak social skills as a child – including that he: has difficulty interacting with his peers, is quiet, was alone while other children played, did not like to or understand how to play games with other kids, did not understand how to play soccer, stuttered, lost track of what he was trying to say, did not understand that his older brother's ghost stories were not real, did not act independently, and had trouble interacting with girls.

Last, Prieto argues his practical skills are deficient because he is incapable of caring for himself, incapable of preparing food for himself, did not have appropriate hygiene, could not walk to school on his own, could not use tools for daily chores, and could not drive by age 13 or 14 when other kids did.

Prieto argues that while it is not necessary to identify the etiology of intellectual disability, it is instructive that a number of risk factors for intellectual disability exist

here, including malnutrition, poor bonding, lack of proper stimulation, extreme family stress, poverty, lack of proper intervention, lack of early identification.

Prieto's argument with respect to his adaptive behavior deficits is based in large part on the testimony of Dr. Weinstein, who concluded that Prieto had adaptive behavior deficits during his developmental years. (J.A.I at 12741.) Dr. Weinstein opined that Prieto's verbal skills far outweighed his processing and application skills,[43] and testified that Prieto scored a 64 on the non-verbal IQ test. (J.A.I at 12713, 12715.) Thus, Prieto emphasizes the deficits in Prieto's non-verbal behavior.

Prieto attempts to explain the testimony showing his ability to function by relying on Dr. Weinstein's explanation that individuals who are intellectually disabled can do "just about everything" including: conversing, crossing streets, shopping, working, reading and writing. (J.A.I. 12750.) However, this Court cannot selectively rely on portions of one expert's testimony in order to support a particular theory of the case. This Court's task is limited to determining whether Prieto has met his burden to show that there is clear and convincing evidence that no reasonable juror would have sentenced him to death because he is intellectually disabled. *Dretke*, 541 U.S. at 393 (quoting *Sawyer*, 505 U.S. at 336). The Court reviews the entire record to accomplish this task.

Dr. Weinstein interviewed several of Prieto's family members and friends in El Salvador. He testified that they all stated he was "slow compared to his siblings,"

---

[43] For example, Dr. Weinstein testified that Prieto drafted complaints to the administration of the jail from time to time, and used legal words in those complaints. (J.A.I at 12747.)

withdrawn, had problems learning simple tasks, and that he was gullible as a child. (J.A.I at 12732.)

Prieto cites the testimony of Dr. Mark Cunningham, who primarily discussed outside factors which would have affected Prieto's decision-making, but did not discuss his specific capabilities at length. Dr. Cunningham explained that "[s]omebody who has an IQ score of 73, by the time they get to high school work they are not going to be able to perform in a high school class at grade level with an IQ score of 73. It's just not enough horsepower to be successful at that." (J.A.II at 25331–32.) Further, he explained that "[c]hronic trauma results in anger, despair and in time numbing, in other words, the person no longer responds to the effects of the experience." (J.A.II at 25408.)

Prieto also relies on the testimony of his brother, Guillermo Prieto who testified about some of their family troubles, including frequent absences of their father; their father's physical abuse of their mother; their father's prison sentence; and that Prieto had night terrors after their mother left them. (J.A.II at 25149, 25152, 25155–156, 25157–158.) Guillermo Prieto testified to the horrors of the civil war, including their grandfather's murder. (J.A.II at 25172–179.)

Guillermo Prieto's testimony also supports the conclusion that Prieto is not intellectually disabled. While Guillermo Prieto testified that they received grades in Elementary School in El Salvador based on group, not individual, performance, Prieto appeared to have performed above average in school in El Salvador, and a report card of Prieto's that was admitted into evidence characterized each student as receiving an individual grade. (J.A.II at 25164, 2517–18.) Guillermo Prieto also explained that Prieto

87

was able to read and converse on the scriptures, and that he wrote letters to their family members. (J.A.II at 25140–141.)

The Commonwealth presented abundant evidence that Prieto's adaptive functioning was not limited. The Commonwealth presented evidence

> that Prieto received consistently good grades in elementary school; that he was capable of handling money and opening and closing his own bank accounts, obtaining employment, operating heavy equipment, and obtaining drivers' licenses in two states; that he was fluent in Spanish and English; that he was capable of using the inmate grievance procedures; that he was interested in and understood current political and foreign policy issues; and that he had the ability to cultivate useful relationships.

*Prieto III*, at 112; (J.A.I at 9334, 14698–702, 14716–24.).

As described *passim*, the Commonwealth established that Prieto acted alone in committing the crimes at issue. *Prieto I*, at 399, 400. ("In this case there was no conclusive evidence of the presence of another perpetrator" . . . "there is overwhelming evidence that Prieto was the sole perpetrator of the murders.") This finding strongly supports the conclusion that Prieto is not intellectually disabled – if he were, it is unlikely he would have been able to carry out these crimes by himself.

Moreover, the Commonwealth presented evidence revealing Prieto's leadership abilities in committing the California crimes. Victim Lisa Barajas testified that she observed and heard Prieto giving orders to the other men, and that they followed through with the orders that he gave to them. (J.A.II at 23737.)

In addition, the Catholic Priest at San Quentin Jail in California testified that

> Alfredo, because his language skill was such that he could help me, [came up to the priest and] on his own initiative just said Father I will help you

88

with the reading, I'll say some of the prayers out loud. And helped me acclimatize [sic] on a regular basis with that population.

(J.A.II at 24777–782.) The priest further noted that the interactions often included Prieto's own impressions of the scripture, and that they would talk after mass about the scripture that day. (*Id.*) He also testified to the high quality of Prieto's English and the fact that Prieto often stopped him when he was making his rounds and asked him questions about the scriptures with his Bible in hand. (*Id.*)

In stark contrast to the evidence in *Hall*, Prieto's high school ESL teacher, Mitchell Hovey, testified that although Prieto was slower than the other kids, "in the first year [he] received C minuses . . . and in the second semester he began to do a little bit better, he got stronger C's, he got a B in math." (J.A.II at 24123–31.) When examining Prieto's report cards from high school, Hovey explained that the first semester Prieto did poorly and then showed improvement before he got involved in gang activity. (*Id.*) Prieto's report card shows that in his second semester, he received mostly B's and C's. (J.A.II at 26826.)

Dr. Samenow explained that during his examination, Prieto

seemed to understand everything I said. His vocabulary was good (all in English). I don't think he had any trouble responding. So I don't think there was a communication or an intelligence or an understanding problem. In fact, he spoke quite well himself and rarely was ungrammatical, occasionally but not often.

(J.A.II at 25656.) Dr. Samenow testified that he questioned Prieto about his schooling in El Salvador (through Eighth Grade) and Prieto attempted to justify his high grades by stating "[w]ell, that must have been because we worked in groups." (J.A.II at 25797–98.)

89

However, the testimony indicates that Prieto received a 6 or a 7 on a scale of 8 or 9 in some subjects. (*Id.*) Thus, he was average or above average in most classes. (*Id.*) In response to a question regarding Prieto's cognitive disability (specifically referencing his 73 IQ score), Dr. Samenow stated, "[t]hat's not a severe cognitive disability. I mean, this man – Mr. Prieto – is bilingual. He reads newspapers. He says he reads books. His vocabulary was quite good, certainly not that of somebody who has a severe cognitive disability." (J.A.II at 25808.)

Dr. Hagan testified that Prieto is bilingual (J.A.II at 22409), able to travel and arrange transportation by himself (J.A.II at 24411–12), able to open up a bank account (J.A.II at 24412), able to obtain employment which involved heavy machinery and which he conducted without supervision and without being injured (J.A.II at 24412), able to obtain a driver's license in Virginia (J.A.II at 24414), able to read and versed himself in current events, and was able to formulate views on U.S. foreign policy in the Middle East (J.A.II at 24414).

Thus, ample evidence shows that Prieto did not demonstrate "significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills." Va. Code § 19.2-264.3:1.1(A)(ii).[44]

---

[44] Prieto alleges that his low intellectual functioning and adaptive functioning manifested before age 18, as required by Va. Code § 19.2-264.3:1.1(A). However, although Dr. Weinstein's testimony about his conclusions regarding Prieto's adaptive behavior deficits pertain to Prieto prior to age 18, (J.A.I at 12741), Dr. Weinstein conceded that no one had previously diagnosed Prieto as intellectually disabled. (J.A.I at 12618–619, 12784–785.) Given the fact that Dr. Weinstein – the only doctor who diagnosed Prieto as intellectually disabled – did so at such a late stage and admitted that there is no existing diagnosis of intellectual disability prior to age 18, the compelling testimony from Dr. Hagan and others regarding Prieto's adaptive functioning, a reasonable juror could have found Prieto did not satisfy the statutory age of onset requirement.

3.    **Intellectual Disability – Va. Code § 19.2-264.3:1.1(A)**

In sum, this Court concludes that Prieto failed to meet his burden to show that

there is clear and convincing evidence that no reasonable juror would have sentenced him

to death because he is intellectually disabled. *Dretke*, 541 U.S. at 393 (quoting *Sawyer*,

505 U.S. at 336). This is particularly evident where twelve reasonable, properly

instructed jurors found that Prieto was not intellectually disabled after hearing and

weighing an abundance of evidence of intellectual functioning and adaptive functioning.

(J.A.I at 8991, 15977–79.) Therefore, Claim V is dismissed.

### XIV.  Alleged Ineffective Assistance of Counsel for Failing to Present Evidence that Prieto is Intellectually Disabled

Prieto argues that trial counsel was ineffective for failing to present evidence at the

2010 sentencing that Prieto is intellectually disabled and therefore ineligible for the death

penalty. The Supreme Court of Virginia already considered this claim and concluded that

Prieto did not satisfy the "performance" or prejudice" prong of *Strickland. Prieto III*, at

111-12.

The Supreme Court of Virginia found that "counsel presented evidence at Prieto's

2008 trial that Prieto is mentally retarded." *Id.* at 111. After hearing all the evidence,[45]

---

[45] The Supreme Court of Virginia highlighted the following evidence from the 2008 sentencing – most of which this Court assessed under Claim V.

> Dr. Ricardo Weinstein testified that Prieto's full scale IQ score on the EWIPA III was 66, that his true score was much lower, taking into consideration the standard error of measurement and the Flynn Effect, and that Prieto had significant deficits in his adaptive functioning, including low academic achievement, poor social skills, and poor practical skills. Dr. Weinstein represented that the EWIPA III was a Spanish translation of the [WAIS III], published in Mexico. Dr. Weinstein

the 2008 sentencing jury found Prieto had not met his burden to show he was
intellectually disabled. (J.A.I at 8991, 15977–79.) Thus, the Supreme Court of Virginia
reasonably held trial counsel's tactical decision "not to argue that Prieto was mentally
retarded, instead focusing on his limited intellect, the trauma he experienced as a child,
the effects of that trauma, and residual doubt of Prieto's culpability in the minds of the

---

testified that he gave Prieto the EWIPA III instead of the WAIS III because
Spanish was Prieto's primary language. Dr. Weinstein further testified he had
scored Prieto's test against American norms, rather than the Mexican norms
established for the EWIPA III, because the Mexican norms were unreliable. Dr.
Weinstein conceded the instructions for the EWIPA III required that the
American norms be used only if the test-taker's IQ seemed to have been
underestimated when measured using the Mexican norms, and that Prieto's full
scale IQ when measured using the Mexican norms was 75.

The Commonwealth presented evidence that Prieto was not mentally
retarded, including evidence that Prieto achieved a full scale score on the WAIS
III of 73, that the EWIPA III that was administered to Prieto was not an approved
test, as required by Code § 19.2-264.3:1.1, that the EWIPA III was not scored in
conformity to established practices, and that it is not acceptable professional
practice to modify an individual's score by subtracting points to accommodate for
the standard error of measurement or the Flynn Effect.

The Commonwealth further presented evidence that Prieto did not suffer
from deficits in his adaptive functioning, including evidence that Prieto received
consistently good grades in elementary school; that he was capable of handling
money and opening and closing his own bank accounts, obtaining employment,
operating heavy equipment, and obtaining drivers' licenses in two states; that he
was fluent in Spanish and English; that he was capable of using the inmate
grievance procedures; that he was interested in and understood current political
and foreign policy issues; and that he had the ability to cultivate useful
relationships. The Commonwealth further presented evidence suggesting the
WAIS III, rather than the EWIPA III, was the appropriate tool for measuring
Prieto's IQ, because at the time the tests were administered, Prieto had been in the
United States for more than twenty-four years, over half of his life, spoke fluent
English and was more fluent in English than in Spanish.

*Prieto III*, at 111–12.

jurors in an effort to mitigate the offenses" was constitutionally reasonable. *Prieto III*, at 112.[46]

Prieto mistakenly relies on *Winston v. Pearson*, 683 F.3d 489, 495 (4th Cir. 2012) to support his argument of ineffective assistance of counsel. Contrary to Prieto's contention, *Winston* supports dismissal of Claim VI. There, the Fourth Circuit found ineffective assistance where the attorneys failed to review available school records and to interview teachers and counselors, where the interviewing of one school official would have provided *new* evidence of Winston's IQ score of 66. *Id.* at 495–6, 505. It is true that "[t]he strong presumption that counsel's choices were part of an overarching strategy 'does not overcome the failure of . . . attorneys . . . to be familiar with readily available documents necessary to an understanding of their client's case.'" *Id.* at 505 (quoting *Hyman v. Aiken*, 824 F.2d 1405, 1416 (4th Cir. 1987)). However, Prieto has not provided the Court with any such "readily available documents necessary to an understanding" of Prieto's case that were not already presented at the 2008 sentencing. *Id.* Thus, *Winston* further bolsters the Court's conclusion that Prieto has not shown ineffective assistance of counsel.

Therefore, having dismissed Claim V for the foregoing reasons, this Court finds that the Supreme Court of Virginia's ruling is not an unreasonable application of U.S.

---

[46] *See Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007) in which the Fourth Circuit found:

> [I]t is clear that the decision of Meyer's counsel not to present mental health mitigation evidence does not constitute deficient performance under *Strickland*. After carefully evaluating the outcome of Meyer's two previous sentencing trials, and the impact psychiatric testimony had on jurors in those cases, Meyer's counsel made a valid strategic choice to try something different.

Supreme Court jurisprudence, and it does not rest upon an unreasonable finding of facts.

Thus, federal habeas corpus relief is inappropriate. 28 U.S.C. § 2254(d)(1)–(2); *Schriro*,

550 U.S. at 473 (citing *Williams*, 529 U.S. at 410).[47]   Accordingly, Claim VI is

dismissed.

## XV. Conclusion

The Court has considered all of Prieto's claims for relief and the host of

supporting arguments set forth in his petition.  For all the reasons stated above, this Court

must grant Respondent's motion, and Prieto's petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 must be denied.  Accordingly, the Stay of Execution

entered by Order dated December 30, 2013 must be vacated.

Furthermore, the Court denies Prieto's requests for an evidentiary hearing.  The

U.S. Supreme Court has explained that "when the state-court record 'precludes habeas

relief' under the limitations of § 2254(d), a district court is 'not required to hold an

evidentiary hearing.'"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (quoting

*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)).  That is the case here.  Moreover, the

record before this Court conclusively demonstrates Prieto is not entitled to relief with

respect to his assertion that he is intellectually disabled.

An appeal may not be taken from the final order in a § 2254 proceeding unless a

judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(A).  A COA

will not issue unless a prisoner makes "a substantial showing of the denial of a

---

[47] Even when the Court considers cumulatively Prieto's claims of ineffective assistance of counsel at sentencing, he fails to demonstrate any reasonable probability that the jury would have returned a different verdict.

94

constitutional right." 28 U.S.C. § 2253(c)(2).  This requirement is satisfied only when

"reasonable jurists could debate whether (or, for that matter, agree that) the petition

should have been resolved in a different manner or that the issues presented were

'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S.

473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  Prieto

fails to satisfy this standard.  The Court will therefore deny a certificate of appealability.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
United States District Judge

Date: Aug. 5, 2014
Richmond, Virginia